Rel: May 3, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

_____

## CR-21-0044

_____

## Christopher Matthew Henderson

## v.

## State of Alabama

## Appeal from Madison Circuit Court
## (CC-17-3064)

McCOOL, Judge.

Christopher Matthew Henderson was convicted of 15 counts of capital murder for intentionally causing the deaths of his wife, Kristen Smallwood ("Kristen"); Henderson and Kristen's unborn child, Loryn Brooke Smallwood ("Loryn"); Kristen's son, Clayton Chambers

("Clayton"); Kristen's nephew, Eli Sokolowski ("Eli"); and Kristen's mother, Carol Jean Smallwood ("Carol Jean"). The murders were made capital because they were committed during the course of committing a burglary in the first degree, see § 13A-5-40(a)(4), Ala. Code 1975; during the course of committing arson in the first degree, see § 13A-5-40(a)(9), Ala. Code 1975; and during one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala. Code 1975. The murder of Kristen was further made capital because it was committed in violation of a court-issued protection order, see § 13A-5-40(a)(19), Ala. Code 1975, and the murders of Loryn, Clayton, and Eli were further made capital because those victims were less than 14 years of age, see § 13A-5-40(a)(15), Ala. Code 1975. The jury recommended by a vote of 11-1 that Henderson be sentenced to death, and the trial court followed the jury's recommendation and imposed that sentence.

## Facts

Henderson and his ex-wife, Rhonda Carlson, were divorced in 2014 after Carlson discovered that Henderson was having an affair with Kristen. Henderson later married Kristen, and, in May 2015, the couple was living in Kristen's parents' house ("the Smallwood house")

2

with her parents; Clayton, who was 8 years old; Eli, who was 14 months old; and Eli's parents. Kristen was also pregnant with Loryn, who was scheduled to be born near the end of August. Henderson and Kristen began "having issues in their marriage" during that time (R. 1504), and, in June 2015, Kristen's father asked Henderson to move out of the Smallwood house. After Henderson moved out, Kristen's father changed the locks on all the exterior doors.

Kristen's brother, Keith Smallwood ("Keith"), testified that, after Henderson moved out of the Smallwood house, the family experienced "odd things that [they] had never experienced" (R. 1505), including hearing "loud noises" in the middle of the night, such as "banging on the garage doors" (R. 1506), and finding a bag of marijuana in the mailbox. Keith also testified that the family discovered that "the light bulb on the light at the garage service door had been unscrewed as if … just loosened enough to where the light would not shine." (Id.) The family had no evidence indicating that Henderson was responsible for those events, but, nevertheless, on July 29, 2015, Kristen obtained from the Madison Circuit Court a temporary ex parte protection order that

3

commanded Henderson to "stay away from" Kristen and her residence.[1] (C. 740.) A deputy with the Madison County Sheriff's Office served Henderson with the protection order the next day. That same day, Keith purchased two surveillance cameras and installed them on the exterior of the Smallwood house; one camera was mounted "so that it would show the view of anyone entering the front of the house or exiting the front of the house" (R. 1513), and the other camera was mounted so that it would "show a view of anyone or any vehicles in the driveway or anyone entering or exiting that side of the home" through the garage door or garage service door. (R. 1514.) The third exterior door -- the back door -- was not surveilled by camera.

After moving out of the Smallwood house, Henderson reconnected with Carlson, and Carlson testified that, by "the end of July, [they] were getting back together." (R. 1761.) Carlson knew that Henderson and Kristen were still married, but Henderson told her that he and Kristen "were working on getting a divorce" (R. 1762) because "they had been arguing and fighting about different things" and "weren't getting along." (R. 1764.) According to Carlson, Henderson was angry during

---

[1]Kristen's petition for a protection order is not included in the record, so the circuit court's basis for issuing the order is not clear.

that time because he felt he had been mistreated by Kristen's father, and, as his anger intensified, he eventually formed a plan to "tak[e] out the entire family." (R. 1766.) Carlson agreed to help Henderson with his plan because she "blamed Kristen for taking [Henderson] away from [her]" (R. 1823), and she "hated that [Kristen] was pregnant with [Henderson's] child" and "wanted revenge." (R. 1826.) Carlson testified against Henderson in exchange for the State's pledge that it would not seek the death penalty against her, and her testimony provided the jury with the details of Henderson's plan and the couple's execution of that plan.

Henderson's plan "was to break into the [Smallwood] house and shoot all the members of the family." (R. 1769.) In order to get into the house, Henderson "was going to pick the lock" on the garage service door (R. 1770), and he purchased a .22 caliber Ruger brand handgun, which he intended to use to commit the murders. Henderson also "started doing research on … how long the baby would be viable in the mother … if he killed … a pregnant mother." (R. 1767-68.) That research was necessary, Carlson explained, because she and Henderson planned to "keep [Loryn]" and "raise [her]" themselves. (R. 1782-83.)

5

However, at some point before the murders occurred, Carlson changed her mind and told Henderson that she "didn't want to be a mom again." (R. 1783.) Carlson's role in the plan was "to make sure that the gas can was full" because she and Henderson "were going to set the house on fire … to make sure that there wasn't any evidence." (R. 1771-72.)

One night a few days before the murders occurred, Henderson and Carlson attempted to execute their plan. However, "the lockpick didn't work on the lock," and the couple "chickened out and decided not to do it." (R. 1770.) Carlson testified that she believed, though was not sure, that Henderson "unscrewed the light bulb" near the garage service door before they left that night. (R. 1771.) Ultimately, though, Henderson and Carlson "decided to [commit the murders] during the day" because they knew that the men who lived in the Smallwood house would not be home at that time. (Id.)

On the afternoon of August 4, 2015, Henderson and Carlson drove to the Smallwood house in Carlson's Jeep sport-utility vehicle, and the plan was that Carlson would "drop [Henderson] off" so that he could commit the murders. (R. 1775.) When they arrived at the house, Carlson got out of the vehicle and checked to see if the garage service

6

door was unlocked, which it was. Henderson then entered the house, and Carlson left in her vehicle and parked on a dirt road behind the house, where she waited for Henderson to contact her on her cellular telephone. As planned, Henderson eventually contacted Carlson and "told [her] to bring the gas can," and Carlson returned to the house. (R. 1778.) When she arrived, Carlson attempted to enter the house through the garage service door, but she could not open the door because "there was a body laying there." (Id.) Speaking through the garage service door, Henderson told Carlson to go to the front door, and, when he opened it for her, she saw "blood on the carpet and all over him" and "saw Clayton's body in a pool of his own blood." (R. 1779.) Henderson "took the gas can out of [Carlson's] hand and started spreading gas down the hallway and through the house" (R. 1779), and "then he lit it on fire with a lighter that he had." (R. 1780.) Henderson and Carlson then left the property in Carlson's vehicle.

Deputies with the Madison County Sheriff's Office were dispatched to the Smallwood house shortly after Henderson and Carlson left, and, when they arrived, they saw "heavy smoke" coming from the house and "flames starting to come from out of the attic area."

7

(R. 1487.)  "[T]wo subjects … in the front yard … started telling [the deputies] that people were inside" the house (id.), but, by that time, "the fire had gotten very large … and the smoke and heat were just too intense," so the deputies could not provide any assistance to those inside the house.  (R. 1488-89.)  After the fire was extinguished, the bodies of Kristen, Clayton, Eli, and Carol Jean were found inside the house; Loryn's body, which had been cut out of Kristen's womb, was also found inside the house.  Shortly thereafter, law enforcement officers viewed the videos recorded by the surveillance cameras that Keith had installed, and those videos were admitted into evidence and played for the jury.  Consistent with Carlson's testimony, the surveillance-camera videos show Carlson enter the Smallwood house through the garage service door, exit a few moments later, and then leave the property; show Carlson return to the property with a gas can, unsuccessfully attempt to enter the garage service door, and then carry the gas can to the front door; and, approximately three minutes later, show a barefoot man whom Carlson identified as Henderson hurrying from the front door, followed by Carlson.  However, no video shows Henderson entering the house.

When Henderson and Carlson left the Smallwood house, they drove to a nearby lake, where they burned Henderson's clothes and shoes. Henderson then "washed off" in the lake because he "was covered in blood" and put on fresh clothes. (R. 1784.) Henderson also threw his .22 caliber handgun into the lake, and, according to Carlson, the handle of the gun was broken because Henderson kept "hitting [Kristen] in the head with it because 'the bitch just wouldn't die.'" (R. 1782.) During the drive to the lake, Carlson asked Henderson "what happened to the baby, and he said that it would end up being whiny and needy like the mom, so he decided that he didn't want the baby." (R. 1783.)

When they left the lake, Henderson and Carlson drove to a Wal-Mart discount store so that Carlson could purchase shoes for Henderson. While at the store, Carlson received a telephone call from her daughter, who told her that law enforcement officers had been to Henderson's mother's house, where Henderson and Carlson were living at the time. Henderson then told Carlson that he "wanted to go to another county" (R. 1775), but Carlson told him that she was "not abandoning [her] kids" (R. 1786), so they returned to Henderson's

9

mother's house and "just waited for the police to get there." (Id.) Henderson and Carlson were arrested at his mother's house soon thereafter and were taken to the Madison County Sheriff's Office, where they were advised of their Miranda[2] rights before being interrogated by Inv. Eugene Nash. Henderson refused to make a statement during his interrogation, but, shortly thereafter, while waiting to be booked into the Madison County jail, Henderson spontaneously said to Inv. Nash: "I'm glad you caught me when you did because I don't believe I could live with what I've done." (R. 1870.)

The next day, Henderson's mother consented to a search of her house. During that search, a Madison County sheriff's deputy discovered a backpack, and, when he picked it up, an unidentified "young female adolescent child yell[ed]: 'That's my daddy's backpack.'" (R. 1718.) That backpack contained, among other items, "one lockpick type gun," some type of punch or tool of some sort," and "a pry bar." (R. 1719.) Sheriff's deputies also found a cellular telephone that belonged to Henderson, and a search of the telephone revealed that, in the month preceding the murders, Henderson had conducted Internet searches on

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

topics such as "how to break glass," "break window homes," ".22 Ruger CGI quiet rounds," ".22 handguns with quiet rounds," "how to break a house window," "how to use a lockpick gun," "quiet way to break a window pane," and "what happens when a person is shot." (R. 1745.) Sheriff's deputies also searched Carlson's Jeep vehicle, where they found two boxes of .22 caliber ammunition and a "lockpick set." (R. 1557.)

Dr. Steven Dunton, a forensic pathologist, testified as to the causes of death for the five victims. Kristen's causes of death were a "gunshot wound of the neck and multiple sharp-force injuries of the head and torso." (R. 1636.) Dr. Dunton also testified that Kristen had suffered "a cut … on the left side of her abdomen" (R. 1642), that "the uterus ha[d] been opened" (R. 1643), and that Loryn had been "removed from the womb." (R. 1664.) Loryn's cause of death was "multiple sharp-force injuries" (R. 1663), including "stab wounds" in her lungs. (R. 1665.) Clayton's cause of death was "multiple sharp-force injuries" (R. 1657), including "stab wounds" in his lungs and in the back of his head. (R. 1659.) Eli's causes of death were "multiple sharp-force injuries and smoke inhalation" (R. 1648); specifically, Eli had suffered a "stab

11

wound" in his abdomen (R. 1650), which breached his intestines, and another "stab wound" in his head, which "enter[ed] his brain." (R. 1653.) Carol Jean's cause of death was "gunshot wounds" to her "upper head" (R. 1626), and she had also been stabbed in the eyes several times. The gunshot wounds to Kristen and Carol Jean were inflicted with a .22 caliber gun. (R. 1859.)

Standard of Review

Rule 45A, Ala. R. App. P., was amended on January 12, 2023, to state:

> "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

Before Rule 45A was amended, this Court was required to conduct plain-error review in all cases in which the death penalty had been imposed. Although Rule 45A now provides that plain-error review is discretionary in such cases, this Court has explained that it will continue to conduct plain-error review in all cases in which the death penalty has been imposed. Iervolino v. State, [Ms. CR-21-0283, Aug. 18,

12

2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023). However, that does not mean that this Court will provide a detailed analysis, or even any analysis, of those claims that were not properly preserved for appellate review, as it historically did when plain-error review was mandatory. Id.

The standard this Court employs in conducting plain-error review is well settled:

> "'"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal." Hall v. State, 820 So. 2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So. 2d 152 (Ala. 2001). Plain error is "error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So. 2d 819 (Ala. 1998). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's 'substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So. 2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So. 2d 237 (Ala. 2000). "The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant." Ex parte Trawick, 698 So. 2d at 167. "[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error." Ex parte Walker, 972 So. 2d 737, 753 (Ala. 2007). Thus, "[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error

13

occurred, and he must establish that the error adversely affected the outcome of the trial." Wilson v. State, 142 So. 3d 732, 751 (Ala. Crim. App. 2010). "[T]he plain error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982)).'"

Iervolino, ___ So. 3d at ___ (quoting DeBlase v. State, 294 So. 3d 154, 182-83 (Ala. Crim. App. 2018)).

## Discussion

## I.

Henderson argues that, on multiple occasions, the trial court violated his right to a public trial, which is protected by both the Sixth Amendment to the United States Constitution and Article I, § 6, of the Alabama Constitution.

"[A]n open and public trial serves important interests." Smith v. State, 213 So. 3d 327, 336 (Ala. Crim. App. 2011). In Waller v. Georgia, 467 U.S. 39, 46 (1984), the United States Supreme Court explained:

> "'"'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the

14

> importance of their functions ....'"' [<u>Gannett Co. Inc. v. DePasquale</u>, 443 U.S. 368, 380 (1979)] (quoting <u>In re Oliver</u>, 333 U.S. 257, 270, n.25, 68 S. Ct. 499, 506, n.25, 92 L. Ed. 682 (1948), in turn quoting T Cooley, Constitutional Limitations 647 (8th ed. 1927)).

> "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury."

(Footnote omitted.) In short, a public trial is one mechanism for "protecting the defendant against unjust conviction," <u>Weaver v. Massachusetts</u>, 582 U.S. 286, 299 (2017), and "has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution." <u>In re Oliver</u>, 333 U.S. 257, 270 (1948).

However, even with these important interests at stake, the right to a public trial is not absolute. As the <u>Waller</u> Court explained, "the right to an open trial may give way in certain cases to other rights or interests," 467 U.S. at 45, and the Court set forth the following test to use in determining whether competing interests justify a closed courtroom:

> "'[1] [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable

15

alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure.'"

Ex parte Easterwood, 980 So. 2d 367, 376 (Ala. 2007) (quoting Waller, 467 U.S. at 48). The first step of the Waller test must be satisfied, though, only when there is "a total closure of the courtroom." Ex parte Easterwood, 980 So. 2d at 376. When there is "only a partial closure of the courtroom, the party seeking the closure need only advance a 'substantial reason' for the closure," as opposed to the "overriding interest" required for a total closure. Id. This lesser standard applies to a partial closure because a partial closure "'"does not raise the same constitutional concerns as a total closure,"'" given that "'"an audience remains to ensure the fairness of the proceedings."'" Id. at 373 (quoting Ex parte Judd, 694 So. 2d 1294, 1296 (Ala. 1997), quoting in turn United States v. Osborne, 68 F.3d 94, 98 (5th Cir. 1995)).

Not only may the public-trial right yield to competing interests, it also does not necessarily extend to every aspect of criminal proceedings. Indeed, the Waller Court noted that the first question it had to answer in that case was whether "the accused's Sixth Amendment right to a public trial extend[s] to a suppression hearing," 467 U.S. at 43 -- a question that would have been unnecessary to the Court's analysis if

16

the right to a public trial automatically extends to every aspect of criminal proceedings. Thus, in reviewing any alleged public-trial violation, the threshold inquiry is whether the right to a public trial extends to the proceeding in question. See United States v. Ivester, 316 F.3d 955, 959 (9th Cir. 2003) ("Though some courts and treatises boldly declare that the Sixth Amendment right to a public trial applies to the entire trial, this position has been rejected by recent decisions which demonstrate that the right to a public trial does not extend to every moment of trial." (internal citations omitted)); United States v. Gallman, 57 F.4th 122, 126 (3d Cir. 2023) (noting that the right to a public trial "likely does not extend" to certain aspects of trial); Smith v. Titus, 958 F.3d 687, 692-93 (8th Cir. 2020) (noting that it was "an open question whether a defendant's right to a public trial encompasse[d] the sort of nonpublic proceeding at issue"); State v. Love, 183 Wash. 2d 598, 605, 354 P.3d 841, 844 (2015) (stating that the first step in reviewing a public-trial claim is to "ask if the public trial right attaches to the proceeding at issue"); State v. Smith, 876 N.W.2d 310, 329 (Minn. 2016) (noting that some "nonpublic proceedings simply may not implicate the Sixth Amendment right to a public trial, depending on the nature of the

17

proceeding"); State v. Reed, 302 Kan. 227, 239, 352 P.3d 530, 540 (2015) (stating that "this case ultimately turns on whether [the defendant's] Sixth Amendment right to a public trial attached to the [proceeding in] question" and holding that it did not; "[n]ot every proceeding is subject to the Sixth Amendment's demand for openness"); and State v. Parks, 190 Wash. App. 859, 864, 363 P.3d 599, 602 (2015) ("'[N]ot every interaction between the court, counsel, and defendants will implicate the right to a public trial or constitute a closure if closed to the public.'" (quoting State v. Sublett, 176 Wash. 2d 58, 71, 292 P.3d 715, 721 (2012))).

Once a court has determined that a defendant's right to a public trial was violated, the violation constitutes a structural error that is not subject to harmless-error review. Ex parte Easterwood, 980 So. 2d at 374. That is to say, the State cannot overcome a public-trial violation by demonstrating that the violation had no effect on the outcome of the trial. See Weaver, 582 U.S. at 299 (noting that, for structural errors, "the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt'" (quoting Chapman v. California, 386 U.S. 18, 24 (1967))). Thus, "in the

case of a structural error <u>where there is an objection at trial</u> and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" <u>Weaver</u>, 582 U.S. at 299 (quoting <u>Neder v. United States</u>, 527 U.S. 1, 7 (1999)) (emphasis added)).

However, "[w]hether an error can be found harmless is … a different question from whether it can be subjected to plain-error review." <u>Puckett v. United States</u>, 556 U.S. 129, 139 (2009). <u>See</u> <u>United States v. Daniels</u>, 91 F.4th 1083, 1095 (11th Cir. 2024) ("Plain error review is different from harmless error review in several respects."); and <u>Ex parte Hicks</u>, 378 So. 3d 1137, 1163 (Ala. 2022) (Mitchell, J., concurring in the result) (noting that there are "important differences between harmless-error review … and plain-error review"). And, while harmless-error review is not applicable to <u>preserved</u> structural errors, plain-error review <u>is applicable</u> to <u>unpreserved</u> structural errors. <u>See</u> <u>Gaston v. State</u>, 265 So. 3d 387 (Ala. Crim. App. 2018) (reviewing an unpreserved public-trial claim for plain error). <u>See</u> <u>also</u> <u>Johnson v. United States</u>, 520 U.S. 461 (1997) (refusing to decide whether the error at issue was a structural error because, even if it was,

19

the facts did not support a finding of plain error); Savoy v. State, 420 Md. 232, 243, 22 A.3d 845, 852 n.4 (2011) ("The overwhelming majority of courts that have considered this issue have held … that un-preserved structural errors are not automatically reversible, but, instead, are subject to plain error review."); Pulczinski v. State, 972 N.W.2d 347 (Minn. 2022) (holding that plain-error review applied to an unpreserved public-trial claim and rejecting the defendant's argument that, because the error was structural, he was entitled to automatic reversal of his conviction); State v. West, 168 Ohio St. 3d 605, 612, 200 N.E.3d 1048, 1054 (2022) ("[A]ssertions of structural error do not preclude an appellate court from applying the plain-error standard when the accused has failed to object."); People v. King, 512 Mich. 1, 10, 999 N.W.2d 670, 676 (2023) ("[U]npreserved constitutional errors, including structural errors, are reviewed for plain error affecting substantial rights."); and State v. Bond, 361 P.3d 104, 117 (Utah 2015) ("[W]hen a defendant raises an unpreserved constitutional claim -- even one serious enough to constitute structural error -- the claim is subject to plain error review.").

In this case, Henderson did not object to any of the courtroom closures that occurred during his trial, so we review his public-trial claim under our plain-error standard. Before addressing Henderson's claim, though, we first address, as part of our plain-error review, an issue he has not raised -- namely, whether the absence of any <u>Waller</u> findings in conjunction with the courtroom closures is in and of itself plain error that entitles Henderson to relief.

### 1. The Absence of <u>Waller</u> Findings

The Alabama Supreme Court explained in <u>Ex parte Easterwood</u>, <u>supra</u>, that "the four-prong test set forth in <u>Waller</u> must be satisfied," with the first prong of the test varying based on the type of closure, before a trial court can close the courtroom to the public. <u>Ex parte Easterwood</u>, 980 So. 2d at 376. We note, though, that the defendant in that case had objected to the courtroom closure, and we have not found an Alabama case that has held that a trial court is required to make <u>Waller</u> findings in the absence of an objection. We also note that the <u>Waller</u> Court itself stated that a courtroom closure that is ordered "<u>over the objections of the accused</u> must meet" the <u>Waller</u> test, 467 U.S. at 47 (emphasis added), which suggests that a trial court's obligation to make

<u>Waller</u> findings is not triggered unless there is an objection to the closure. Other courts have expressly interpreted <u>Waller</u> in that manner. <u>See</u> <u>United States v. Veneno</u>, 94 F.4th 1196, 1204 (10th Cir. 2024) ("<u>Waller</u> mandates that the district court must [make <u>Waller</u> findings] when the courtroom is closed 'over the objections of the accused.'" (quoting <u>Waller</u>, 467 U.S. at 47)); <u>Jones v. State</u>, 883 So. 2d 369, 371 (Fla. Dist. Ct. App. 2004) ("A proper contemporaneous objection in the trial court is necessary to raise the need for <u>Waller</u> findings."); <u>State v. Ingraham</u>, 528 P.3d 966, 972 (Idaho 2023) ("The <u>Waller</u> test only applies if the accused objects to closing the court."); and <u>State v. Starner</u>, 152 N.C. App. 150, 154, 566 S.E.2d 814, 817 (2002) (holding that, when a defendant does not object to a courtroom closure, the trial court is not required to make <u>Waller</u> findings).

As noted, Henderson did not object to any of the courtroom closures that occurred during his trial. Thus, we hold that the trial court was not required to make <u>Waller</u> findings before closing the courtroom. However, even if the trial court was required to make those findings pursuant to <u>Ex parte Easterwood</u>, the court's failure to do so does not in and of itself constitute plain error that entitles Henderson to

relief. Rather, this Court must determine whether the courtroom closures "seriously affect[ed] the fairness or integrity of the judicial proceedings," Iervolino, ___ So. 3d at ___ (citations omitted), and, if they did not, then no plain error occurred, even if the trial court was required to make Waller findings before closing the courtroom. See Starner, 152 N.C. App. at 154, 566 S.E.2d at 817 (holding that a courtroom closure did not constitute plain error, even though the trial court had not made Waller findings); and United States v. Negron-Sostre, 790 F.3d 295, 306 (1st Cir. 2015) (noting, in conducting plain-error review, that the trial court had not made Waller findings but reversing only because "the error affected the fairness, integrity or public reputation of the proceeding as a whole").

We now turn to Henderson's claim that the trial court violated his right to a public trial on multiple occasions.

### 2. Pretrial Status Conference

Henderson argues that the trial court violated his right to a public trial by closing the courtroom during a pretrial status conference that occurred on April 9, 2020. Approximately four weeks earlier, the Alabama Supreme Court had suspended "all in-person court

proceedings" because of the COVID-19 pandemic, <u>Ex parte Brown</u>, 368 So. 3d 951, 953 (Ala. 2022), and the trial court and the parties conducted the April 9 status conference through Zoom, which "is a video-conferencing application that can be used in place of in-person conferences or meetings." <u>Moreno v. State</u>, 367 So. 3d 462, 463 n.1 (Ala. Crim. App. 2021). It does not appear, though, that the trial court used Zoom to provide public access to the April 9 status conference, as the court would later do during the trial, so that status conference was in fact closed to the public.

However, even if the right to a public trial extends to pretrial status conferences, the April 9 status conference involved nothing more than rescheduling an upcoming hearing and a brief discussion as to whether the trial would be able to proceed as scheduled that summer; no legal or evidentiary issues were even cursorily discussed. (R. 151-59.) Thus, it would be incredible to conclude that the public's exclusion from a proceeding involving those routine administrative issues "seriously affected the fairness or integrity of the judicial proceedings." <u>Iervolino</u>, ___ So. 3d at ___ (citations omitted). Indeed, Henderson's appellate counsel conceded during oral argument before this Court that

24

"a discussion about scheduling or things of that nature that are clearly administrative ... certainly would not rise to the level of a public-trial violation" (Oral Argument Recording, 22:30-39), and that is exactly what occurred at the April 9 status conference. Accordingly, the closed status conference did not rise to the level of plain error.

### 3. Suppression Hearing

Henderson argues that the trial court violated his right to a public trial during a pretrial suppression hearing, at which he argued that the incriminating statement he made to Inv. Nash should be suppressed. The United States Supreme Court has held that the right to a public trial extends to a suppression hearing. <u>Waller</u>, <u>supra</u>.

The suppression hearing occurred in October 2020. By that time, the Alabama Supreme Court had "entered an order resuming in-person hearings," <u>Ex parte Brown</u>, 368 So. 3d at 953, but trial courts were still contending with COVID-19. Thus, in preparation for the suppression hearing, the trial court issued an order that states, in relevant part:

> "Based on recent developments related to the COVID-19 pandemic and in order to maintain appropriate social distancing it is hereby ordered as follows:
>
> "With regard to the parties, the [suppression] hearing shall be attended by the attorneys and their respective

client. The State shall be authorized to bring one (1) family representative of the victims. The Defendant shall be authorized to bring one (1) supporter as well.

"....

"The Courtroom will have designated seats for attendees to use. Two (2) seats will be reserved for news media. Other than the seats reserved herein, any remaining seats shall be available on a first come, first serve basis for members of the public. Once the designated seating is filled, no further attendees will be allowed to enter the courtroom."

(C. 87.)

As evidenced by the trial court's order, the courtroom was not closed during the suppression hearing but, instead, was open to the public on a "first come, first serve basis." Indeed, Henderson does not allege that the courtroom was closed during that hearing; rather, he argues that his right to a public trial was violated because, he says, "public access was severely limited."[3] (Henderson's brief, p. 24.)

It does appear from the trial court's order that the available seating in the courtroom was more limited during the suppression hearing than it would have been had the court not been contending with COVID-19. However, Henderson has not identified anyone who wanted

---

[3]Henderson's reliance on Ex parte Easterwood, supra, is misplaced, then, because in that case the trial court excluded the public from the courtroom.

26

to attend the hearing and was unable to do so. Furthermore, limited seating is a reality in every courtroom, and the fact that seating is available for the public during a trial, but might not be sufficient to accommodate all who desire to attend, does not transform the trial into a closed proceeding. As the United States Court of Appeals for the Ninth Circuit has explained:

> "'Obviously, the public trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats. [The guarantee will already have been met, for the 'public' will be present in the form of those persons who did gain admission. Even the actual presence of the public is not guaranteed.] A public trial implies only that the court must be open to those who wish to come, sit in the available seats, conduct themselves with decorum, and observe the trial process.'"

United States v. Shryock, 342 F.3d 948, 974 (9th Cir. 2003) (quoting Estes v. Texas, 381 U.S. 532, 588-89 (1965) (Harlan, J., concurring)). See also United States v. Kobli, 172 F.2d 919, 923 (3d Cir. 1949) (stating that the right to a public trial does not require a trial court to hold the trial "in a place large enough to accommodate all those who desire to attend"); Ingraham, 528 P.3d at 972, 973 (holding that there was no public-trial violation when, as a result of COVID-19, "public attendance was limited, but the courtroom was not closed"; "[n]othing in

either the Idaho or federal constitutions requires a definitive number of seats be made available in a courtroom"); People v. Kocontes, 86 Cal. App. 5th 787, 877, 302 Cal. Rptr. 3d 664, 741 (2022) ("Kocontes cites to no authority, and we found none, that holds decreasing the number of available public seats amounts to a constitutional closure."); and Bunn v. Lopez, 740 F. App'x 145, 146 (9th Cir. 2018) (not selected for publication in the Federal Reporter) (noting that "space limitations" are "a reality in every courtroom" and holding that the fact that some of the defendant's supporters had been unable to attend the trial as a result of the limited seating "did not transform the trial into a closed proceeding").

"[T]he cases interpreting the right to a public trial … conceive of an exclusion as an affirmative act specifically barring some or all members of the public from attending a proceeding." Long v. State, 121 N.E.3d 1085, 1088 (Ind. Ct. App. 2019). See also United States v. Smadi, 15 F.3d 153, 154 (10th Cir. 1994) ("The denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom."). That is not what happened at the suppression hearing that occurred in this

28

case. Instead, the suppression hearing was open to the public, and, although the available seating might have been limited, Henderson has not identified anyone who wanted to attend the hearing and was unable to do so. Also, although the trial court's order stated that only one seat would be reserved for Henderson's supporters, nothing in the court's order prohibited his supporters from occupying the seats that were available on a "first come, first serve" basis. Thus, the suppression hearing was not closed in any sense of the word, and, as a result, Henderson's right to a public trial was not violated during that hearing. See State v. Cross, 771 N.W.2d 879, 882 (Minn. Ct. App. 2009) (holding that "it cannot be said that the courtroom was 'closed' to any member of the public" because "no one who wished to attend … was prevented from entering the courtroom").

### 4. Voir Dire

Henderson argues that the trial court violated his right to a public trial by allegedly closing the courtroom during the first day of voir dire. The United States Supreme Court has held that the right to a public trial extends to voir dire. Presley v. Georgia, 558 U.S. 209 (2010).

On the first day of trial, 130 summonsed citizens appeared for jury duty. It does not appear that the courtroom was open to the public during voir dire due to the large venire and to the fact that trial courts were still contending with COVID-19. (R. 413-14.) Thus, to accommodate the public, the trial court used Zoom to broadcast the trial to other rooms in the courthouse, where the public could observe the trial. Henderson does not argue that broadcasting his trial to a remote viewing location constituted a courtroom closure for purposes of the Sixth Amendment. To the contrary, Henderson's appellate counsel conceded during oral argument before this Court that the Zoom broadcast was "a proper way to address the social-distancing needs and the need for public access." (Oral Argument Recording, 15:44-50.) Henderson contends, though, that the Zoom broadcast "did not begin until the second day" of voir dire. (Henderson's brief, p. 21.) Thus, according to Henderson, there was a total closure of the courtroom on the first day of voir dire.

When a defendant alleges a public-trial violation, "the initial burden of proof is on the defendant to show that the trial [was] closed to the public. If the defendant fails to carry that burden, the analysis is

concluded." <u>Cameron v. State</u>, 490 S.W.3d 57, 69 (Tex. Crim. App. 2014). <u>See also</u> <u>State v. Gomez</u>, 183 Wash. 2d 29, 34, 347 P.3d 876, 879 (2015) ("[T]he appellant ... bear[s] the burden of supplying a record that is sufficient to show that the proceeding in question was actually closed."). The problem with Henderson's argument, then, is that the record does not affirmatively indicate that the trial court did not use the Zoom broadcast on the first day of voir dire, and the allegation of closure made by Henderson's appellate counsel is not evidence to that effect. <u>State v. R.C.</u>, 195 So. 3d 317, 322 (Ala. Crim. App. 2015). We also note that the State has not conceded that the trial court did not use the Zoom broadcast on the first day of voir dire.[4]

"A silent record, that is a record that <u>on its face contains no evidence to support the alleged error</u>, does not establish an obvious error." <u>Iervolino</u>, ___ So. 3d at ___ (emphasis added; citations omitted).

---

[4]In its brief, the State argues that "the record lacks any indication that the trial was completely closed to the public during the first day of voir dire." (State's brief, p. 21.) Likewise, during oral argument before this Court, the State argued that, with respect to "whether the livestream was turned on for the first day of voir dire, there is no evidence that the court did not do what [it] intended to do" (Oral Argument Recording, 28:05-12), i.e., use Zoom to broadcast the trial to other rooms in the courthouse where the public could view the proceedings.

Indeed, this Court does not ever '"presume … facts not shown by th[e] record and make them a ground for reversal,'" Crow v. State, 195 So. 3d 346, 352 (Ala. Crim. App. 2015) (quoting Carden v. State, 621 So. 2d 342, 346-47 (Ala. Crim. App. 1992)), and we certainly will not rely on presumed facts as a basis for finding plain error.  Thus, because there is no evidence indicating that the trial court did not use the Zoom broadcast on the first day of voir dire, there is no basis for concluding that Henderson's right to a public trial was violated at that time.  See United States v. Titus, 78 F.4th 595, 601-02 (3d Cir. 2023) (rejecting the defendant's public-trial claim because the record was ambiguous as to whether the courtroom had in fact been closed during jury selection).

We acknowledge Henderson's attempt to circumvent this lack of evidence by pointing to the facts that the trial court "was extremely diligent about noting when the [Zoom broadcast] was turned on and off" and "spent time explaining the [Zoom broadcast] to the jurors." (Henderson's reply brief, p. 9.)  Henderson then goes on to allege that "none of this began until the second day of voir dire." (Id.)  Thus, during oral argument before this Court, Henderson's appellate counsel argued that it is "very clear from the context" that the trial court first used the

Zoom broadcast on the second day of voir dire. (Oral Argument Recording, 49:10.)

We give Henderson credit for a creative argument but not a persuasive one. The facts Henderson cites arguably support an inference that the trial court did not use the Zoom broadcast on the first day of voir dire, but it is not an <u>unequivocal</u> inference that <u>necessarily</u> flows from those facts. In other words, those facts do not lead to the inescapable conclusion that the trial court did not use the Zoom broadcast on the first day of voir dire. For an appellate court to find plain error, though, "the facts that comprise the error [must be] <u>irrefutable</u>," and the reviewing court must not be required to "choose between competing inferences to find [the error]." <u>State v. Stacey</u>, 302 Or. App. 470, 478, 459 P.3d 261, 266 (2020) (emphasis added; citations omitted). Stated differently, "[w]hen review is sought under the plain error doctrine[,] this Court must be able to discern from the record, without resort to speculation or <u>equivocal</u> inference, what occurred at trial." <u>Tompkins v. State</u>, 705 P.2d 836, 843 (Wyo. 1985) (emphasis added; citation omitted). Here, Henderson's allegation that the trial court did not use the Zoom broadcast on the first day of voir dire does

33

not rest upon facts that necessarily and inevitably lead to that conclusion, and the State has not conceded that the allegation is true. Thus, there is not a sufficient factual basis upon which to predicate a finding of plain error with respect to this claim.

### 5. Charging Conferences

Henderson argues that the trial court violated his right to a public trial by closing the courtroom during the charging conferences. Before conducting the guilt-phase charging conference, the trial court "exclude[d] everybody who is not a lawyer or a party from the courtroom" and "mute[d] Zoom as well and stop[ped] the video." (R. 1894, 1899.) The trial court repeated that process before conducting the penalty-phase charging conference. (R. 2169-70.) In support of its decision to exclude the public from those conferences, the trial court stated that it "always handle[s] [the charging conferences] with just the parties and the lawyers … so that the lawyers can feel a little more free in terms of what [they] can cover and speak about." (R. 1887.)

Henderson has not cited any authority providing that the right to a public trial extends to a charging conference, and it does not appear that the United States Supreme Court, the Alabama Supreme Court, or

this Court has ever expressly held that it does. Thus, this claim raises a question of first impression under controlling authority. We also note that this issue has not been uniformly settled among other jurisdictions, with some courts holding that the right to a public trial does not extend to charging conferences -- see, e.g., State v. Koss, 181 Wash. 2d 493, 334 P.3d 1042 (2014); and State v. Miller, 179 Wash. App. 91, 316 P.3d 1143 (2014) -- and some holding that it does -- see, e.g., State v. Pulkrabek, 975 N.W.2d 572 (N.D. 2022).

"In Townes v. State, 253 So. 3d 447 (Ala. Crim. App. 2015), this Court addressed the propriety of resolving issues of first impression under plain-error review:

"'"It is well settled that plain-error review is an inappropriate mechanism to decide issues of first impression or to effectuate changes in the law." Kelley v. State, 246 So. 3d 1032, 1052 (Ala. Crim. App. 2014). See also United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) ("[A] court of appeals cannot correct an error [under the plain-error doctrine] unless the error is clear under current law."); United States v. Madden, 733 F.3d 1314, 1322 (11th Cir. 2013) ("For a plain error to have occurred, the error must be one that is obvious and is clear under current law." (citations and quotations omitted)); United States v. Accardi, 669 F.3d 340, 348 (D.C. Cir. 2012) ("[A] question of first impression ... would be inappropriate to address under plain error review."); United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003) ("[T]here

35

can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." (citations omitted)); United States v. Magluta, 198 F.3d 1265, 1280 (11th Cir. 1999) ("[A] district court's error is not 'plain' or 'obvious' if there is no precedent directly resolving an issue."), vacated in part on unrelated grounds, 203 F.3d 1304 (11th Cir. 2000). Whether error resulted from the prosecutor's comment "is an issue of first impression and thus not properly before this Court for plain-error review." Kelley, 246 So. 3d at 1053 (citing Accardi, 669 F.3d at 348).'"

Lane v. State, 327 So. 3d 691, 715-16 (Ala. Crim. App. 2020).

We need not and do not determine at this time whether the right to a public trial extends to a charging conference. Rather, because we are reviewing Henderson's public-trial claim for plain error only, it is sufficient to note that there is no controlling authority that provides a definitive answer to that question. Thus, it is not "obvious and … clear under current law" that the closed charging conferences violated Henderson's right to a public trial, Lane, 327 So. 3d at 715 (citations omitted), and, as a result, we cannot say that the closed conferences rose to the level of plain error. See Gallman, 57 F.4th at 129 (holding that "any error in closing the [trial] to the public did not constitute reversible plain error because it was not 'clear under current law' that

36

the Sixth Amendment public-trial right attached to the closed proceedings" (quoting United States v. Olano, 507 U.S. 725, 734 (1993))).

Moreover, Henderson argues that, because the charging conferences were closed to the public, there was not a safeguard in place to "ensur[e] that [the] judge and prosecutor carr[ied] out their duties responsibly" and "to guard against the misconduct of participants." (Henderson's brief, pp. 23-24.) However, Henderson's counsel did not raise any objections during the charging conferences or make even so much as a cursory argument in favor of or against any of the trial court's proposed instructions (R. 1897-1934, 2170-84), and Henderson has not alleged on appeal that any government misconduct occurred during those conferences. In other words, there are no "allegations of government misconduct that required circulation in the fresh air that accompanies public observation," Reed, 302 Kan. at 243, 352 P.3d at 542, and our own review of the charging conferences has not revealed even a hint of government misconduct. We also note that, although the charging conferences were not open to the public, the trial court's instructions to the jury were open to the public (R. 1990, 2184), which

37

allowed for public scrutiny of the law that controlled the jury's deliberations. Thus, even if the right to a public trial extends to charging conferences, it is difficult to see (and Henderson does not explain) how the public's exclusion from the charging conferences in this case "seriously affected the fairness or integrity of the judicial proceedings." Iervolino, ___ So. 3d at ___ (citations omitted). For that reason as well, we cannot say that the closed charging conferences rose to the level of plain error.

### 6. Bench Conferences

Henderson argues that the trial court violated his right to a public trial when it "muted the Zoom feed" during three bench conferences, at which he made "important arguments regarding [his] right to confront witnesses against him and right to remain silent." (Henderson's brief, p. 26.) We note, as we did with respect to the charging conferences, that it is not clear under controlling authority whether the right to a public trial extends to bench conferences at which a trial court entertains objections and makes routine evidentiary rulings. In fact, multiple courts have held that a trial court is not required to ensure that such conferences are open to the public. See Darby v. State, [Ms. CR-20-

0919, March 24, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023) (McCool, J., concurring specially) (collecting cases from other jurisdictions that have held that the right to a public trial does not extend to bench conferences). See also Gallman, 57 F.4th at 126 ("The public-trial right likely does not extend to sidebars or bench conferences."); and Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 598 n.23 (1980) (Brennan, J., concurring) ("[W]hen engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle."). Regardless, we need not and do not make that determination at this time because, even if the right to a public trial does extend to bench conferences, no plain error occurred in this case.

It is true that the trial court muted the Zoom broadcast during part or all of three bench conferences that occurred during the guilt phase of trial. (R. 1590-98, 1623-25, 1868-70.) However, the Zoom broadcast was not the only avenue the public had for viewing the trial. Rather, the record indicates that, in addition to the Zoom broadcast, the courtroom was open to the public, albeit with what appears to have been somewhat limited seating due to COVID-19, and that members of

the public were in fact in the courtroom during the guilt phase of trial. (R. 1449-50, 1482, 1617, 1894.) Thus, although those members of the public who were viewing the trial remotely were excluded from the three bench conferences, the public as a whole was not excluded from them. As the Kentucky Supreme Court has explained: "The requirement [of a public trial] is fairly observed if ... a reasonable proportion of the public is suffered to attend."[5] St. Clair v. Commonwealth, 140 S.W.3d 510, 555 (Ky. 2004) (citations omitted). In addition, the bench conferences were recorded and transcribed into the record, which provides further public scrutiny of all that occurred during the conferences. See State v. Morales, 932 N.W.2d 106, 114 (N.D. 2019) ("Where a bench conference is held in view of … the public …, despite their inability to hear what is said, the public trial right is satisfied by prompt availability of a record of those proceedings."). Therefore, even if the trial court erred by muting the Zoom broadcast during the three bench conferences, this Court cannot say that the error

---

[5]Even if no members of the public were actually present in the courtroom during the bench conferences, that fact would not give rise to a public-trial violation. The right to a public trial "implies only that the court must be open" to the public; "the actual presence of the public is not guaranteed." Estes v. Texas, 381 U.S. 532, 589 (1965) (Harlan, J., concurring).

was "particularly egregious" or that it "seriously affect[ed] the fairness or integrity of the judicial proceedings." Iervolino, ___ So. 3d at ___ (citations omitted). Accordingly, no plain error occurred.

### 7. Public Access to Prospective Jurors' Identities

Henderson argues that the trial court violated his right to a public trial when it "limited the public's access to information about the identity of the [prospective] jurors." (Henderson's brief, p. 26.) Specifically, during voir dire, the trial court ensured that the Zoom broadcast was not "showing the faces of the [prospective] jurors," and the court identified the prospective jurors by number, rather than by name. (Id.) The trial court explained to the prospective jurors that it would not show their faces on the Zoom broadcast "to protect [their] confidentiality" and that it would identify them by number, rather than by name, so that voir dire would be more organized. (R. 690.)

In support of his argument, Henderson cites Press-Enterprise Co. v. Superior Ct. of California, 464 U.S. 501 (1984). In that case, the trial court closed voir dire to the public because it was concerned that, if the proceedings were not closed, the prospective jurors might lack the candor to reveal potentially sensitive information about themselves.

41

The United States Supreme Court acknowledged that there might circumstances in which there are "legitimate reasons" for ensuring that prospective jurors' "deeply personal matters" are "ke[pt] out of the public domain." Id. at 511. The Court held, though, that a trial court cannot "constitutionally close" voir dire in the interests of juror privacy without first satisfying what would later come to be known as the Waller test. Press-Enterprise, 464 U.S. at 511.

Press-Enterprise does not support Henderson's argument. Although that case clearly provides that voir dire must be open to the public, absent competing interests that justify closure, nothing in the Court's opinion provides that the public must be given access to the prospective jurors' identities while observing voir dire. See Morgan v. Dickerson, 253 Ariz. 207, 210, 511 P.3d 202, 205 (2022) ("[T]he [United States] Supreme Court has not addressed whether … public access to voir dire examinations extends to learning jurors' names."); Perez v. People, 302 P.3d 222, 226 n.7 (Colo. 2013) ("[T]here is nothing in Press-Enterprise to suggest that a defendant has a constitutional right to have prospective jurors' names read into the record."); United States v. Black, 483 F. Supp. 2d 618, 624 (N.D. Ill. 2007) (noting that Press-

42

Enterprise guarantees public access to voir dire but stating that "whether [there is] a constitutional right to learn the jurors' names" is a "distinct issue"); State ex rel. Beacon J. Publ'g Co. v. Bond, 98 Ohio St. 3d 146, 155-56, 781 N.E.2d 180, 191-92 (2002) (noting that the United States Supreme Court has not yet addressed whether the public's "right of access extends to the list of juror names"); and State v. Johnson, 203 N.E.3d 78, 98 (Ohio Ct. App. 2022) (distinguishing Press-Enterprise in holding that there was no plain error in the trial court's "use of juror numbers in place of juror names").

In this case, for all that appears in the record, the public was able to observe voir dire through the Zoom broadcast.[6] The only aspect of those proceedings that was hidden from the public was the prospective jurors' identities, but Henderson has not cited any authority providing that it constituted error, much less plain error, for the trial court to conduct voir dire in that manner. We also note that the venire list, which includes the prospective jurors' full names, addresses, birth dates, races, and genders, is a court exhibit that is available to the

---

[6]Henderson continues to allege that the trial court did not use the Zoom broadcast on the first day of voir dire, but, as we have already explained, nothing in the record unequivocally supports that allegation.

public. See State v. Martin, 4 So. 3d 1196, 1202 (Ala. Crim. App. 2008) ("The Alabama Supreme Court [has] noted that exhibits that are admitted at trial are within the 'public domain' and are subject to inspection."). Cf. Press-Enterprise, 464 U.S. at 512 (noting that "the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time"). Thus, we cannot say that the trial court committed plain error by concealing the prospective jurors' identities during voir dire proceedings that were open to the public.

## II.

Henderson raises two claims stemming from his conviction for capital murder under § 13A-5-40(a)(19). We address each of those claims in turn.

## 1.

Henderson first argues that the State's evidence was not sufficient to sustain a conviction under § 13A-5-40(a)(19), which provides, in relevant part, that a person commits capital murder if he commits murder "where a court had issued a protective order for the victim,

44

against the defendant, pursuant to Section 30-5-1 et seq., [Ala. Code 1975]." Thus, according to Henderson, the trial court should have granted his motion for a judgment of acquittal on the charge alleging that he violated § 13A-5-40(a)(19).

It is undisputed that, approximately one week before Kristen's death, the Madison Circuit Court issued a temporary ex parte protection order against Henderson and in favor of Kristen, and that order commanded Henderson to "stay away from" Kristen and her residence. Henderson argues, though, that the State's evidence was not sufficient to prove that the protection order was still in effect at the time of Kristen's death. The State argues in response that it was not required to prove that the protection order was still in effect at that time. Instead, the State argues, the plain language of § 13A-5-40(a)(19) requires only that "a court had issued a protective order for the victim," and whether that order was still in effect at the time of the victim's death is, according to the State, irrelevant. Alternatively, the State argues that, even if its interpretation of § 13A-5-40(a)(19) is wrong, its evidence was sufficient to prove that the protection order was still in effect at the time of Kristen's death.

45

This Court has never addressed whether a conviction under § 13A-5-40(a)(19) requires the State to prove that a previously issued protection order was still in effect at the time of the victim's death. We agree, though, with Henderson's interpretation of the statute. "'As we have so often said, statutes must be given a reasonable interpretation, not one that is illogical, incompatible with common sense, or that would reach an absurd result that could not possibly have been intended by the Legislature.'" Berry v. State, 299 So. 3d 336, 346 (Ala. Crim. App. 2020) (quoting P.J.B. v. State, 999 So. 2d 581, 587 (Ala. Crim. App. 2008)). To accept the State's interpretation of § 13A-5-40(a)(19) could, without question, lead to illogical and absurd results that defy common sense -- for example, a person convicted of violating the statute even though the protection order supporting the conviction had expired decades earlier. The Alabama Legislature could not have intended, and indeed did not intend, such an illogical and absurd result. To the contrary, the legislature expressly stated that its purpose in enacting § 13A-5-40(a)(19) was "to make it a capital offense for a defendant to murder a person in violation of a protection order issued on behalf of the victim against the defendant," which is to say that the order must

be in effect at the time of the victim's death. Act. No. 2014-432, Ala. Acts 2014 (emphasis added). Furthermore, the State's interpretation of § 13A-5-40(a)(19) flies in the face of two well-settled legal principles: (1) that criminal statutes must be narrowly interpreted in favor of the accused, Ex parte Curran, 372 So. 3d 579, 583 (Ala. Crim. App. 2022), and (2) that capital-murder statutes must serve to narrow, not broaden, the class of persons eligible for the death penalty, Ex parte Gentry, 689 So. 2d 916, 917 (Ala. 1996).

We thus hold that a conviction for capital murder under § 13A-5-40(a)(19) requires proof that a court had issued a protection order against the defendant and in favor of the victim and that the order was in effect at the time of the victim's death. Having made that determination, we must next determine whether the State's evidence was sufficient to prove that element of the offense. In reviewing the sufficiency of the State's evidence, this Court

> "'"must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution."' Ballenger v. State, 720 So. 2d 1033, 1034 (Ala. Crim. App. 1998) (quoting Faircloth v. State, 471 So. 2d 485, 488 (Ala. Crim. App. 1984), aff'd, 471 So. 2d 493 (Ala. 1985)). '"The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the

evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt."' Nunn v. State, 697 So. 2d 497, 498 (Ala. Crim. App. 1997) (quoting O'Neal v. State, 602 So. 2d 462, 464 (Ala. Crim. App. 1992)). '"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision."' Farrior v. State, 728 So. 2d 691, 696 (Ala. Crim. App. 1998) (quoting Ward v. State, 557 So. 2d 848, 850 (Ala. Crim. App. 1990)). 'The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So. 2d 1040, 1042 (Ala. 1978)."

Wilson v. State, 142 So. 3d 732, 809 (Ala. Crim. App. 2010).

Section 30-5-6(b), Ala. Code 1975, provides that "[a]ny granted temporary ex parte protection order shall be effective until the final hearing date," which must occur "within 10 days of the perfection of service" on the defendant. § 30-5-6(a), Ala. Code 1975. In this case, the State's evidence indicated that, on July 29, 2015 -- six days before Kristen was murdered -- the Madison Circuit Court issued a temporary ex parte protection order against Henderson and in favor of Kristen and that the order was served on Henderson the next day. The protection order also contains a handwritten note that states: "This case is consolidated w/ DR-15-900602 [(Henderson and Kristen's divorce

48

proceedings)], which is set for trial ... on August 3, 2015." (C. 741.) That trial date was, of course, one day before Kristen's death on August 4, 2015.

Relying on the handwritten note, Henderson argues that the final hearing on the temporary protection order occurred on August 3, 2015 -- the day before Kristen was murdered -- and that, "as such, the ex parte order expired on that date." (Henderson's brief, p. 38.) Henderson's appellate counsel also noted during oral argument before this Court that the record contains an August 3, 2015, text message in which Henderson stated: "I won my first case today against my ex." (C. 316.) However, both the handwritten note and the text message are ambiguous; neither provides clear evidence that the final hearing on the temporary protection order actually occurred on August 3, 2015. Indeed, Henderson's text message could have been a reference to some other aspect of the divorce proceedings, which, according to the handwritten note, were scheduled for trial on that date. Furthermore, even if the final hearing did occur on that date, the circuit court had the option of converting the temporary protection order to a final protection order that could have remained in effect indefinitely. See § 30-5-7(d)(2),

49

Ala. Code 1975. Thus, although the handwritten note and the text message certainly provided a basis for Henderson to argue to the jury that the temporary protection order was not in effect at the time of Kristen's death, they did not render the State's evidence insufficient on that issue. Stated differently, the handwritten note and the text message may impact the weight of the evidence concerning the temporary protection order, but not the sufficiency of that evidence. See Williams v. State, 10 So. 3d 1083, 1087 (Ala. Crim. App. 2008) (noting that any apparent "'inconsistencies and contradictions in the State's evidence … [go] to the weight of the evidence and [create a question] of fact to be resolved by the jury'" (quoting Rowell v. State, 647 So. 2d 67, 69-70 (Ala. Crim. App. 1994))).

The evidence in this case indicated that the temporary protection order was issued and served on Henderson less than 10 days before Kristen's death. Thus, considered in a light most favorable to the State, the evidence was sufficient to prove that the protection order was still in effect at the time of Kristen's death. Accordingly, the trial court did not err by denying Henderson's motion for a judgment of acquittal on the charge alleging that he violated § 13A-5-40(a)(19).

2.

Henderson also argues that, without proper proof that he had been served with the protection order, he could not be convicted of violating § 13A-5-40(a)(19). Henderson conceded during oral argument before this Court that the State presented evidence indicating that he had been served with the protection order, but he challenges the admissibility of that evidence. Henderson did not raise this claim below, so we review it for plain error only.

To prove that Henderson had been served with the protection order, the State presented a copy of the return of service, which contains a handwritten statement from Deputy Brad Beasley of the Madison County Sheriff's Office, who wrote on the return that he served Henderson with the order on July 30, 2015. (C. 742.) However, Deputy Beasley did not testify at trial, and Henderson argues that the admission of the return of service therefore violated the Confrontation Clause of the Sixth Amendment. Thus, according to Henderson, the only evidence indicating that he had been served with the protection order was inadmissible. We disagree.

"Only <u>testimonial</u> hearsay implicates the Confrontation Clause." <u>Brown v. Epps</u>, 686 F.3d 281, 286 (5th Cir. 2012) (emphasis added). <u>See also</u> <u>Keaton v. State</u>, 375 So. 3d 44, 115 (Ala. Crim. App. 2021) (noting that the admission of "'nontestimonial evidence'" does "not violate the defendant's right to confrontation" (quoting <u>Craft v. State</u>, 90 So. 3d 197, 216 (Ala. Crim. App. 2011))); and <u>United States v. Watson</u>, 525 F.3d 583, 588-89 (7th Cir. 2008) ("The Confrontation Clause does not … apply to statements that are not testimonial in nature."). Whether the hearsay statements contained within a document are testimonial in nature hinges on whether the document was "created solely for an 'evidentiary purpose,'" <u>Bullcoming v. New Mexico</u>, 564 U.S. 647, 664 (2011) (quoting <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305, 311 (2009)), i.e., whether its "primary purpose" was to serve as "an out-of-court substitute for trial testimony," <u>Michigan v. Bryant</u>, 562 U.S. 344, 358 (2011)), designed "to establish or prove some fact at trial." <u>United States v. Yeley-Davis</u>, 632 F.3d 673, 680 (10th Cir. 2011). Thus, as a general rule, "business records are not testimonial for Confrontation Clause purposes" because such records are usually "'created for the administration of an entity's affairs and not for the purpose of

establishing or proving some fact at trial.'" <u>Craft v. State</u>, 90 So. 3d 197, 215-16 (Ala. Crim. App. 2011) (quoting <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305, 324 (2009)). <u>See</u> <u>Perkins v. State</u>, 897 So. 2d 457, 464 (Ala. Crim. App. 2011) (noting that business records "bear the earmark of reliability or probability of trustworthiness," which "satisfies the core value of the Confrontation Clause").

In this case, the return of service for the protection order was not created for use as evidence in Henderson's trial; indeed, service was perfected and documented before Kristen's murder had even occurred. Rather, the return of service was merely an administrative or ministerial act that served to ensure that Henderson had received the notice to which he was statutorily entitled and had thereby been advised of the conduct prohibited by the protection order. <u>See</u> § 30-5-6; and <u>Ex parte C.C.</u>, [Ms. CL-2023-0368, May 31, 2023] ___ So. 3d ___ (Ala. Civ. App. 2023). In other words, the return of service was simply a record of the Madison Circuit Court that was created and kept in the ordinary course of administering protection orders, i.e., a business record. That conclusion is corroborated by the testimony of Deputy Joseph Rice of the Madison County Sheriff's Office, who testified that

the sheriff's deputies routinely serve protection orders and record service of those orders as part of their official duties. (R. 1752-53.) Thus, because the return of service was not created for use as evidence in Henderson's trial, it was not testimonial in nature and therefore was not subject to the Confrontation Clause. Accordingly, the trial court did not err, and certainly did not commit plain error, by admitting the return of service into evidence without the testimony of the sheriff's deputy who served the protection order. See Keaton, 375 So. 3d at 115 (holding that court records that had been created before the defendant committed her crimes were not testimonial in nature because they "were prepared in the ordinary course of business for the purpose of administering the affairs of law enforcement …, not for the purpose of proving some fact at [the defendant's] trial").

Of course, the return of service for the protection order was ultimately used as evidence in Henderson's trial, but that fact does not mean the document was testimonial evidence that was subject to the Confrontation Clause. As the Colorado Supreme Court explained when addressing the same issue:

>"Here, the 'statement' at issue is the return of service for the protection order. The return of service includes a

signed affidavit by the person who completed service, as well as the time and date of service. This document was offered into evidence at Garcia's trial to prove that he had received notice of the protection order and had therefore violated it by remaining in the apartment. It was admitted even though the individual who served the order didn't testify; meaning, Garcia could not cross-examine him about the order served or the service itself.

"On appeal, the district court concluded that the return of service was testimonial because proof of service is a necessary element of the crime of violation of a protection order. It reasoned that the return of service document 'is testimonial hearsay because it was generated in anticipation of criminal prosecution to provide proof necessary for conviction of the alleged criminal behavior to which it avers.'

"But we must consider what the primary purpose of a return of service document is <u>at the time it is made</u>, not when it is used at trial.

"According to statute, once a court has issued a temporary protection order,

"[a] copy of the complaint, a copy of the temporary civil protection order, and a copy of the citation must be served upon the respondent .... The citation must inform the respondent that, if the respondent fails to appear in court in accordance with the terms of the citation, a bench warrant may be issued for the arrest of the respondent, and the temporary protection order previously entered by the court made permanent without further notice or service upon the respondent.

"§ 13-14-104.5(9), C.R.S. (2020). Thus, service of these documents provides notice to the respondent of the upcoming

hearing and confers jurisdiction over the respondent to the court.

"Moreover, when the return of service is completed, <u>no crime related to the order served has yet occurred</u>. <u>See</u> <u>People v. Espinoza</u>, 195 P.3d 1122, 1126-27 (Colo. App. 2008) ('The documents were not created in response to an interrogation or a request from the prosecution regarding criminal conduct but were created before defendant engaged in the conduct for which he was charged.'). Nor is there any objective expectation that a crime -- violation of the protection order -- necessarily will occur. The primary purpose of the return of service is, therefore, administrative and not prosecutorial.

"The fact that it may subsequently be used to prove an element of the crime of violation of a protective order does not transform the return of service into a testimonial statement. <u>See</u> <u>id.</u>; <u>Logan v. Commonwealth</u>, 72 Va. App. 309, 845 S.E.2d 228, 234 (2020) ('[A] record of service of process [is not] "evidence against" anyone as the framers understood the Confrontation Clause's mandate. Simply because the return of service <u>might</u> be relevant in a future prosecution does not make it testimonial.')."

<u>People v. Garcia</u>, 479 P.3d 905, 908-09 (Colo. 2021) (emphasis added; some internal citations omitted). Other states are in accord. <u>See</u> <u>Gaines v. State</u>, 999 N.E.2d 999, 1004-05 (Ind. Ct. App. 2013) ("The primary purpose of the return of service is administrative -- ensuring that the defendant received notice of the protective order. Although the return of service <u>may</u> be used later in a criminal prosecution, the return of service was not created solely for use in a pending or future criminal

56

prosecution. As such, we conclude that the return of service was not testimonial, and its admission did not violate [the defendant's] rights under the Confrontation Clause." (internal citation omitted)); Logan v. Commonwealth, 72 Va. App. 309, 322-23, 845 S.E.2d 228, 234-35 (2020) ("[T]he return of service was created and filed with the court to serve purely administrative and statutory purposes, and would have been created regardless of whether Logan ever subsequently violated the order or made material misrepresentations about its existence on unrelated forms. … Although the return of service certainly could be relevant in a later criminal prosecution …, the fact remains that the primary purpose of the return of service at the time of its creation was not in contemplation of future prosecution, but rather an administrative and purely ministerial duty imposed by a civil statute."); State v. Copeland, 353 Or. 816, 848, 306 P.3d 610, 628 (2013) ("[T]he [United States Supreme] Court has not held, nor otherwise indicated, that a document primarily created for an administrative purpose could be rendered testimonial merely by the possibility that it might be used in a later criminal prosecution."); State v. Shivers, 230 Ariz. 91, 95, 280 P.3d 635, 639 (2012) ("Although the possibility existed the [return of service]

could be used in a later prosecution if Shivers violated the [protection order], the [return] remains non-testimonial because its purpose at the time of creation was not prosecutorial."); and <u>Commonwealth v. Shangkuan</u>, 78 Mass. App. Ct. 827, 834, 943 N.E.2d 466, 472-73 (2011) ("It is true that a return of service might be used in a later criminal prosecution to furnish proof that the defendant was on notice of the abuse prevention order entered against him. … [H]owever, a return of service is not created solely for use in a pending criminal prosecution. For this reason, it is not testimonial for purposes of the confrontation clause." (footnotes and internal citation omitted)).

We agree with the Colorado Supreme Court and those like-minded courts we have cited. The fact that a return of service for a protection order might be used in a future prosecution, or even is used in a future prosecution, does not mean that the document is testimonial evidence that is subject to the Confrontation Clause. Rather, with respect to documents, the dispositive factor for purposes of the Confrontation Clause is the primary purpose for which the document was created, <u>Bryant</u>, 562 U.S. at 358, and, as we have already explained, a return of service for a protection order is nothing more than an administrative or

ministerial act that, <u>at the time it is created</u>, merely serves to ensure that the defendant was made aware of the prohibited conduct and received the due process to which he was entitled. The defendant's decision to later violate the protection order does not unilaterally transform the return of service into testimonial evidence that is subject to the Confrontation Clause.

## III.

Henderson argues that the trial court erred by admitting the videos recorded by the two surveillance cameras that Keith had installed on the Smallwood house a few days before Kristen was murdered. We begin our analysis of this claim by explaining why we have reviewed it for plain error only.

Before trial, Henderson filed a motion in limine seeking to exclude the surveillance-camera videos from evidence, arguing that the State could not authenticate the videos under the test established in <u>Voudrie v. State</u>, 387 So. 2d 248 (Ala. Crim. App. 1980). In October 2020, the trial court held an evidentiary hearing at which the State attempted to authenticate the videos through the testimony of Keith; his wife, Brittany Smallwood ("Brittany"); and Inv. Jason McMinn of the

Madison County Sheriff's Office. Following that hearing, the trial court denied Henderson's motion, but the court made clear that it was "not relieving [the State] of [its] obligation to lay the necessary foundation at trial" and that the hearing had essentially served to "giv[e] everybody a peek as to what we are anticipating potentially seeing at trial." (R. 291-92.)

Henderson's trial began in June 2021, approximately eight months after the hearing on his motion in limine. Before the parties gave their opening statements, the following colloquy occurred:

> "THE COURT: … Anything we need to take up from the State?
>
> "[THE STATE]: Judge, if I could just -- for clarification and for logistics of calling witnesses, we had the pretrial hearings specifically on the surveillance videos, the Voudrie hearing, and you denied [Henderson's] motion in limine and indicated that the Voudrie standard had been met, so we plan on not calling all the foundation witnesses we called in the pretrial hearing because that's part of the record already. We would just be using Keith Smallwood to identify and play those, but we didn't want to get into a situation an hour and a half from now where we are in disagreement as to the court's -- our understanding of the court's order in that matter.
>
> "THE COURT: Anything from the defense on that?
>
> "[DEFENSE COUNSEL]: Was that, in fact, your order, Judge? I can't even remember all the orders we've gotten.

"THE COURT: I would have to go back. I don't have my binder in here. ... I'll pull up and look exactly at what my order provided.

"....

"THE COURT: I found it. My order entered on November 13, 2020, Paragraph Number 2: 'The motion in limine filed by [Henderson] with regards to the surveillance video clips recorded ... at the location of the offense is hereby denied. The State presented witnesses and exhibits sufficient to meet the admissibility threshold set out within the applicable caselaw.' But I do have a recollection that it wasn't just a blanket admission. Quite frankly, as I sit here and I think about -- was it Inv. McMinn who testified?

"[THE STATE]: Judge, there were actually several. We had Keith testify about installing the system; we had Brittany Smallwood testify about how the alert system works in the emails and how she set up that side it; and then we had Inv. McMinn testify about the technological side of it. We're still going to have some minimal testimony for the jury to understand how the system works, but as far as laying the foundation, it kind of changes the order that we have to call witnesses and do things. For today's purposes, we were going to have Keith Smallwood testify about numerous things, one of which was the installation of the system and his recognition of those video clips, having seen them before, and they haven't been altered or amended.

"THE COURT: I think Inv. McMinn is still going to have to testify as to that particular system and the reliability of it, period.

"[THE STATE]: Yes, sir, understood."

(R. 1443-46.) At trial, the State once again attempted to authenticate the surveillance-camera videos through the testimony of Keith, Brittany, and Inv. McMinn. Following their testimony, the State proffered the videos for admission, and Henderson's counsel stated: "There is no objection to that." (R. 1572.)

Generally, "'"an adverse ruling on a motion in limine does not preserve the issue for appellate review unless an objection is made at the time the evidence is introduced."'" Lane, 327 So. 3d at 713 (quoting Saunders v. State, 10 So. 3d 53, 87 (Ala. Crim. App. 2007), quoting in turn Moody v. State, 888 So. 2d 532, 582 (Ala. Crim. App. 2003)). An exception to this general rule exists, however, when "'"the trial court's ruling on the motion in limine is absolute or unconditional."'" Lane, 327 So. 3d at 713 (quoting Saunders v. State, 10 So. 3d 53, 87 (Ala. Crim. App. 2007), quoting in turn Perry v. Brakefield, 534 So. 2d 602, 606 (Ala. 1988)).

In this case, Henderson received an adverse ruling on his motion in limine regarding the surveillance-camera videos, but the trial court's ruling was not absolute or unconditional. To the contrary, the trial court clearly stated at the hearing on that motion that it was "not

relieving [the State] of [its] obligation to lay the necessary foundation at trial." Then, shortly before the opening statements, the trial court reminded the parties that it had not provided a "blanket admission" of the videos at the pretrial hearing that had occurred eight months earlier and that the State would be required to authenticate the videos before they would be admitted at trial. Thus, Henderson could preserve this issue for appellate review only by objecting to the videos when the State proffered them for admission at trial, which he failed to do. Accordingly, because Henderson did not properly preserve this claim for appellate review, we review it for plain error only. See Lane, 327 So. 3d at 713 (holding that the trial court's ruling on a pretrial motion in limine did not preserve the issue for appellate review because the court had informed the parties that the State would be required to "lay the proper predicate" at trial, and the defendant did not object when the evidence was proffered for admission).

There are two avenues by which a video can be authenticated for admission into evidence: the pictorial-communication theory and the silent-witness theory. Ex parte Fuller, 620 So. 2d 675, 678 (Ala. 1993). "Under the pictorial-communication theory, a video recording may be

authenticated by a person who has '"sufficient personal knowledge of the scene or events pictured"' and testifies that the recording '"accurately and reliably represents the actual scene or sounds."'" J.S. v. State, 376 So. 3d 566, 577 (Ala. Crim. App. 2022) (quoting McCray v. State, 88 So. 3d 1, 62 (Ala. Crim. App. 2010), quoting in turn Ex parte Fuller, 620 So. 2d at 678). In other words, the pictorial-communication theory requires testimony from "'a qualified and competent witness [who] can testify that the … recording … accurately and reliably represents what the witness sensed at the time in question.'" Harrison v. State, [Ms. CR-21-0423, Aug. 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023) (quoting Ex parte Fuller, 620 So. 2d at 678). Without such a witness, the proponent of the video must proceed under the silent-witness theory, which requires the proponent to satisfy the Voudrie test as a means of demonstrating that "'the process or mechanism by which the [video] [was] made ensures reliability and trustworthiness.'" Harrison, ___ So. 3d at ___ (quoting Ex parte Fuller, 620 So. 2d at 678).

> "Rewritten to have more general application, the Voudrie standard requires:
>
> > "'(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a

witness would have seen or heard had a witness been present at the scene or event recorded,

"'(2) a showing that the operator of the device or process or mechanism was competent,

"'(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,

"'(4) a showing that no changes, additions, or deletions have been made,

"'(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,

"'(6) identification of the speakers, or persons pictured, and

"'(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.'"

Harrison, ___ So. 3d at ___ (quoting Ex parte Fuller, 620 So. 2d at 678).

In this case, the State attempted to authenticate the surveillance-camera videos under the silent-witness theory through the testimony of Keith, Brittany, and Inv. McMinn.[7]  Keith testified that, on July 30,

_____

[7]We note that, because Carlson appears on the relevant videos, she likely could have authenticated the surveillance-camera videos under the pictorial-communication theory. See Harrison, ___ So. 3d at ___ (noting that "the pictorial-communication theory applies when a

2015, he purchased an Arlo brand security system, which included two surveillance cameras, and that the security system "c[a]me with an instruction booklet, so [he] followed that, how to set it up, how to install it -- or attach it to the home as well as connect it so it would be a live system." (R. 1512.) Keith also testified that the cameras were "connect[ed] … to an Internet line, … and the … video … is transferred to the cloud; it's a cloud-based system." (R. 1509.) According to Inv. McMinn, "cloud-based systems … are not recording to a hard drive; they are recording to a remote server, or the cloud, where it is collected wirelessly." (R. 1531.) The security cameras did not record continuously but, instead, were triggered by motion, and Keith testified that "notifications could be set up via email" so that he and other occupants of the Smallwood house would be alerted when one of the cameras began recording. (R. 1509.) Although Keith installed the cameras, it was Brittany who "set up the email notifications, the electronic side of it, the cloud side of things, made sure all of that was

---

witness who observed what is depicted on the video is available to testify at trial and can testify that the video accurately reflects what the witness observed"). However, the State chose to proceed under the silent-witness theory, so we analyze this claim under that standard.

66

done correctly." (R. 1517.) Regarding the functioning of the cameras,

Keith testified as follows:

"Q. So … were you able to determine if this system appeared to be working as you would expect it to, according to the instructions?

"A. We did. We did check and made sure that it was showing myself, for example, on the camera as a test. Then also, it did pick up motion. If a vehicle drove past the home, it would pick that up as well. We were receiving notifications for all those types of things.

"….

"Q. Did it appear to be doing what it was supposed to be doing?

"A. Yes, ma'am, it did.

"Q. Did you ever have any reason to believe, between, I guess, July 31 and August 4, that it had stopped working?

"A. No, not at all. It was working fine. Notifications were being received each day.

"Q. Do you know who all had access to the setup side of it, like who could grant user access, who could delete, things like that? Do you know who that would be?

"A. My wife Brittany.

"Q. Is Brittany the only person that had access to download and delete videos and things like that?

"A. Yes. To my knowledge, that is correct.

67

"Q. Did you ever have anything to do with that, using Brittany's password or anything like that? Did you ever delete or add anything?

"A. I did not.

"....

"Q. To your knowledge, were some of those cloud-based videos still available … to download from the cloud [after the fire]?

"A. They were available. They were able to be seen as they normally would any other time.

"Q. Specifically around the surrounding timeframe of these events, did you have occasion to view the video clips that were captured by the system?

"A. I did, yes, ma'am.

"Q. Do you know who all assisted law enforcement in getting those clips downloaded?

"A. … As far as getting and retrieving the actual video surveillance, my wife is the only one that I know of that actually had hands-on assistance with that."

(R. 1517-20.) Keith also testified that he had had an opportunity to review the surveillance-camera videos before trial and that he had not seen "any additions, deletions, [or] alterations to any video from what [he] had originally seen back when it happened." (R. 1572.)

Brittany testified as follows regarding her role in providing law enforcement with the videos stored in "the cloud":

"Q. Subsequent to the events, or immediately following the event of August 4, 2015, … did you assist law enforcement in accessing the surveillance videos … via the email system and the alerts?

"A. Yes.

"Q. Tell us how you did that. Tell us what your part in that was.

"A. On-site, I pulled up my phone to show them the emails that were received so that they could see the videos.

"….

"Q. Upon review of those emails, did you also review the actual surveillance videos that are related to those notifications ?

"A. Yes.

"Q. To your understanding, is there an email for each video clip?

"A. Yes.

"….

"Q. Is there a time stamp on the emails as far as when they are received …?

"A. Yes.

"Q. Have you had a chance, in the past, to review the email date/time stamp and the video date/time stamps in this case?

"A. Yes.

"Q. Are they consistent within about a minute?

"A. Yes.

"Q. So a video comes in, the alert goes out, the email is about a minute behind?

"A. Yes.

"Q. You have the administrative access, right? You helped set this up?

"A. Yes.

"Q. Have you ever altered, amended, or tampered with any of the videos on this system, ever?

"A. I have not.

"Q. Specifically as to the dozen or so videos we're talking about here today, did you ever delete, access, add, do anything other than just simply print the emails and help law enforcement … mak[e] sure they got downloaded?

"A. I did not."

(R. 1565-68.)

Inv. McMinn testified that he was "very familiar" with Arlo security systems (R. 1532), and he testified as to how those systems function:

> "Q. With regards to the Arlo System and some of the other wireless systems, talk to us about how those systems work in detecting when to take video, how they upload and things like that, how that works.
>
> "A. Most of the cameras of that type … are motion-activated; they are not continuously on. If they were, the battery wouldn't last a day. But they are tripped by infrared signal which trips the motion activation, and you will get from when motion is activated on the camera to whenever they set for the duration of the clip to last, which you can set it for different cameras, different durations, or you can set it for different preferences on there for how it's saved, when it's saved, the sensitivity of the system, and such like that.
>
> "Q. Is it your understanding that those type systems -- I'm just going to throw out an example. If it detected motion right now, it might be preset by the factory to record for 10 seconds and then stop?
>
> "A. Yes, that's quite possible.
>
> "Q. On some of those systems, can you change that? Can you tell it, 'I would like to record it for 30 seconds and stop'?
>
> "A. Yes, on most of them you can.
>
> "Q. You talked about sensitivity. So if I had a camera right here and it's pointing that direction, could the user, now especially, tell it not to detect anything out too much further than about 50 feet out?

71

"A. You can set the intensity of the signal, and it will either detect or not detect certain forms of motion.

"Q. Once the camera is triggered, for lack of a better term, and starts to record, what does the camera do with the data its recording and how does that go somewhere?

"A. That's wirelessly transferred to the router that would be in the house. Especially with the Arlo System, it would be a router system that's hooked into the Internet, and that video would be transferred, through that node or router, to the cloud.

"….

"Q. Tell us what you think of when I say the term 'buffering,' things like that.

"A. Buffering would be time for it to catch up. … It's trying to catch up with what it's trying to do, or it's actually building up, trying to store or throw data to that.

"….

"Q. Back six years ago, if an Arlo captured a video, would it be your understanding that the buffering took a little longer back then because of Internet speeds or camera speeds?

"A. Internet speeds, but also the activation in the signal. Any disruption with that signal through any media would disrupt the timing of that signal. It wouldn't be an instant trip. So you may get somebody that comes into view and trips the camera, but the camera doesn't start recording and the data is not captured until they are halfway through the frame.

72

"Q. Say it's set for 20 seconds, just by the factory, to record 20 seconds. Once it gets to the end of that 20 seconds of recording, is there any kind of buffering that it takes before it gets where it's going in the cloud?

"A. After that 20-second interval, it will end the video. It may have a delay or a buffer tripping, but when it says, 'Okay, it's tripped at this,' 20 seconds later, it's going to shut that video. But it may be something depending on what they had set in their preferences. They may say, 'Hey, take it" -- if there is motion still active, they may take it past that.

"Q. Let me ask a different way. Once the system has captured a video and it's at the end of its pre-determined time to video, especially on the older systems like in 2015, what is your understanding of that camera's ability to immediately record another video clip?

"A. It may have a delay in motion. With most clips, there may be a preset delay, 'Do not record another clip until there is another motion for five seconds,' something like that. It's all in the preference. You can set it any way you want to, depending on where the camera is. But you may have a preference in there, 'Do not record another clip for another 30 seconds until it's motion activated. Do not' -- it's all in the preferences for that Arlo. ….

"Q. So maybe if you have it pointed at your street, and there is a dog walker that comes into frame, it records for 10 seconds, and then you've told it, 'Don't record for another 30 seconds because I don't want to watch this person walk their dog up the street'?

"A. Right. ….

"Q. So it is possible, especially with the older Arlo system, that someone could have been within range of a video camera on an Arlo system, but it not have recorded

73

that person because of the settings or because of the buffering or because of something like that?

"A. It's quite possible they walked in the frame, tripped it, and walked out of the frame before the camera -- you know, you're talking -- it depends on how close it is to the -- if you're dealing with something that's a close camera, it's a possibility that somebody or something would come in the frame, activate the camera, and they could walk out of the frame before the camera is even on and transmitting.

"....

"Q. ... [D]id you have occasion to review Arlo footage and help download Arlo footage from a surveillance camera at [the Smallwood house]?

"A. Yes, ma'am.

"Q. Do you recall how that came to you and how you came to be involved in handling that surveillance video?

"A. I was asked to respond to a residence. The password and the instruction manual was given to me with information on how and when they were wanting the video downloaded from. We actually downloaded the video there at the Crime Scene Lab at the office.

"Q. During that download, did you have any technical issues, any glitches? Did you appear to lose any of the video recorded as you were trying to download or anything like that?

"A. No, ma'am. They were downloaded straight from Arlo's website.

"Q. Did you review those video clips?

74

"A. Yes, ma'am.

"Q. Did they appear to be consistent with the Arlo systems that you were familiar with operating correctly?

"A. Yes, ma'am.

"Q. Did you have occasion to review their -- what's called a creation date of the file that existed?

"A. Yes, ma'am.

"Q. Were those dates consistent with the date of the events at [the Smallwood house] on August 4, 2015?

"A. Yes, ma'am."[8]

(R. 1532-38.)

In Harrison, supra, this Court stated:

"Rule 901(a), Ala. R. Evid., provides that '[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' The authentication requirement is a relatively low threshold to meet. '[A]ll that is required under Rule 901' is that the proponent of the evidence make 'a prima facie showing that the [evidence] … is likely authentic'; the proof of authenticity 'does not [have to] establish beyond a shadow of a doubt the authenticity of the

---

[8]In his brief to this Court, Henderson focuses almost exclusively on the testimony the State presented at the hearing on his motion in limine. However, because the trial court required the State to authenticate the surveillance-camera videos at trial, the proper focus is on the testimony the State presented at that time, which is the testimony we have cited.

[evidence]' and '"does not have to be conclusive or overwhelming."' Royal Ins. Co. of America v. Crowne Inv., Inc., 903 So. 2d 802, 809 (Ala. 2004) (quoting the Advisory Committee's Notes to Rule 901). See also United States v. McDaniel, 433 F. App'x 701, 704 (10th Cir. 2011) ('We have repeatedly instructed that Rule 901[, Fed. R. Evid.,] sets a low bar for admissibility.')."

Harrison, ___ So. 3d at ___.

In short, the testimony from Keith, Brittany, and Inv. McMinn indicated that the surveillance cameras were triggered to record by motion, that the cameras were recording properly at the time they were installed, that the cameras continued to record properly until they were destroyed by the fire, that the videos the cameras recorded were stored in "the cloud," that Brittany was the only person who had access to the videos stored in "the cloud," that Brittany had not altered the videos stored there, that Brittany provided law enforcement with access to the videos stored in "the cloud" shortly after the fire, and that the videos law enforcement officers watched shortly after the fire were the same videos the State proffered at trial. That testimony was more than adequate to satisfy the low threshold of demonstrating that the surveillance-camera videos were "what [the State] claim[ed]" they were, Rule 901, Ala. R. Evid., i.e., videos recorded by the surveillance cameras

76

installed on the Smallwood house, and that the videos were "likely authentic," i.e., that they had been reliably recorded and preserved without any "changes, additions, or deletions." Harrison, ___ So. 3d at ___ (citations omitted). Thus, the State properly authenticated the surveillance-camera videos under the Voudrie test. Compare Horton v. State, 217 So. 3d 27, 63 (Ala. Crim. App. 2016) (holding that the State had failed to satisfy the Voudrie test because there was "no testimony that the surveillance camera … was working properly and that it was capable of accurately recording at the time the video was made" (emphasis added)); and Spradley v. State, 128 So. 3d 774, 782 (Ala. Crim. App. 2011) (holding that the State had failed to satisfy the Voudrie test because the record was "totally devoid of any of the [Voudrie] requirements" (emphasis added)).

We acknowledge Henderson's argument that the surveillance-camera videos did not record properly because, he says, there are unexplained "critical gaps in the videos." (Henderson's brief, p. 16.) For example, Henderson notes that, although the cameras were triggered to record by motion, in some videos "a vehicle appears on the property without any video showing how it arrived"; that "at least one [video]

77

cuts off when there is obviously ongoing motion"; that, in one video, "a white male is shown exiting the house, who the prosecution claimed was Henderson, but no [video] shows him entering"; and that another video shows Carlson approaching the house but that no video "show[s] her driving up to the home and parking or getting out of her car." (Id. at 14-17.) However, Inv. McMinn provided an explanation for why the cameras, even when working properly, might have stopped recording during "ongoing motion" and might not have recorded every motion that occurred on the property. Thus, any "gaps" in the videos went to the weight to be afforded the videos, not their admissibility. See Capote v. State, 323 So. 3d 104, 134 (Ala. Crim. App. 2020) (noting that a video is not rendered inadmissible simply because it "'does not show a continuity of action'" (quoting UAW-CIO v. Russell, 264 Ala. 456, 470, 88 So. 2d 175, 186 (1956))).

The admissibility of evidence is left to the sound discretion of the trial court. Floyd v. State, 289 So. 3d 337, 395 (Ala. Crim. App. 2017). Here, the State presented evidence sufficient to establish that the surveillance-camera videos were authentic, and "[t]he ultimate determination of the authenticity of the … videos was a question for the

jury." <u>Harrison</u>, ___ So. 3d at ___. Thus, the trial court committed no error, much less plain error, in admitting those videos.

IV.

Henderson argues that the trial court erred by admitting into evidence the autopsy reports, which were admitted over his objection. According to Henderson, the admission of the autopsy reports violated the Confrontation Clause of the Sixth Amendment because Dr. Kathleen Enstice, who conducted the autopsies, did not testify at trial.[9] This Court previously rejected this same claim in <u>Thompson v. State</u>, 153 So. 3d 84, 128, 129 (Ala. Crim. App. 2012), holding that "it [is] not a violation of the Confrontation Clause to admit an autopsy report without the medical examiner's testimony" because "autopsy reports are nontestimonial in nature." Thus, the trial court did not err by admitting the autopsy reports.

Moreover,

> "'violations of the Confrontation Clause are subject to harmless-error analysis.' <u>Smith v. State</u>, 898 So. 2d 907, 917 (Ala. Crim. App. 2004). ... '[B]efore a federal constitutional error can be held harmless, the [reviewing] court must be able to declare a belief that it was harmless beyond a reasonable doubt.' <u>Ex parte Baker</u>, 906 So. 2d 277, 287 (Ala.

---

[9]Dr. Enstice was deceased by the time of trial.

2004) (quoting <u>Chapman v. California</u>, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). '"'The question is whether there is a reasonable probability that the evidence complained of might have contributed to the conviction.'"' <u>James [v. State]</u>, 723 So. 2d 776, 781 [(Ala. Crim. App. 1998)] (quoting <u>Chapman</u>, 386 U.S. at 23, 87 S. Ct. 824, quoting in turn <u>Fahy v. Connecticut</u>, 375 U.S. 85, 86-87, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963)). In determining whether such an error is harmless, this Court must look at 'the importance of the [evidence] in the prosecution's case, whether the [evidence] was cumulative, the presence or absence of … corroborating or contradicting [evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)."

<u>Floyd</u>, 289 So. 3d at 406-07.

In this case, the autopsy reports were not of particular importance to the State's case because the causes of the victims' deaths were not in dispute. In fact, when making his objection to the autopsy reports, Henderson's counsel expressly stated that Henderson was not disputing the victims' causes of death. (R. 1597.) <u>See</u> <u>Ex parte Baker</u>, 473 So. 2d 1130, 1131 (Ala. 1985) ("[W]e find that the admission of [the autopsy] report without cross-examination of the doctor who prepared it was harmless error. The cause of death was not disputed."); and <u>Thompson</u>, 153 So. 3d at 129 (noting that "there was no dispute that the officers and the dispatcher were shot to death" and that, as a result, "even if it

80

was error to admit the autopsy reports, that error was harmless beyond a reasonable doubt").

In addition, Dr. Dunton, who was subject to cross-examination, testified as to the causes of the victims' deaths. And, although Dr. Dunton referred to the causes of deaths set forth in Dr. Enstice's autopsy reports, he did not merely recite her conclusions. Instead, Dr. Dunton testified that he had conducted an "in-depth review" of "the entire file," including the autopsy photographs (R. 1622), and he provided his own expert opinions regarding the causes of death based on his personal review of the file. (R. 1635-36, 1647-48, 1663.) Thus, Dr. Dunton's testimony was cumulative to the information contained in the autopsy reports. See Gobble v. State, 104 So. 3d 920, 959 (Ala. Crim. App. 2010) ("'The erroneous admission of evidence that is merely cumulative is harmless error.'" (quoting Dawson v. State, 675 So. 2d 897, 900 (Ala. Crim. App. 1995))); and Ex parte Phillips, 287 So. 3d 1179, 1209 (Ala. 2018) (holding that any Confrontation Clause violation that had occurred was rendered harmless by cumulative evidence).

Finally, there was overwhelming evidence of Henderson's guilt, including Carlson's testimony; a surveillance-camera video that shows

him fleeing the Smallwood house shortly before it was engulfed in flames; his Internet searches for topics such as "how to break a house window," "how to use a lockpick gun," and "what happens when a person is shot"; and his own statement to Inv. Nash that he "[did not] believe [he] could live with what [he had] done." See Taylor v. State, 695 So. 2d 250 (Ala. Crim. App. 1996) (holding that any Confrontation Clause violation that had occurred was rendered harmless by the overwhelming evidence of the defendant's guilt).

Based on the foregoing, there is not a reasonable probability that the admission of the autopsy reports contributed to the jury's verdicts. Thus, any error in admitting those reports was harmless error that does not entitle Henderson to relief. See Floyd, 289 So. 3d at 407-08 (holding that any Confrontation Clause violation that had occurred was harmless because the allegedly inadmissible evidence was not critical to the State's case, was cumulative to other evidence, and there was overwhelming evidence of the defendant's guilt).

## V.

Henderson argues that the trial court committed multiple errors during its jury instructions. (Henderson's brief -- Issues V, VI, XX, and

XXI.) Henderson raised no objections to the trial court's jury instructions, so we review these claims for plain error only. This Court has thoroughly considered the arguments Henderson has raised in support of these claims, the authorities he has cited, and the applicable parts of the record. Having done so, we are convinced that no plain error occurred during the trial court's jury instructions, and we do not find it necessary to provide analyses for all of these claims. We have, however, chosen to provide analyses for Henderson's claims that the trial court should have instructed the jury on certain lesser-included offenses and should have instructed the jury that an accomplice's testimony must be corroborated by other evidence.

## 1. Lesser-Included Offenses

Henderson argues that the trial court should have instructed the jury on two lesser-included offenses: felony murder and, with respect to the offenses against Loryn, reckless manslaughter. In reviewing these claims, we are guided by the following well-settled principles:

> "'"A person accused of the greater offense has a right to have the court charge on lesser included offenses when there is a reasonable theory from the evidence supporting those lesser included offenses." MacEwan v. State, 701 So. 2d 66, 69 (Ala. Crim. App. 1997). An accused has the right to have the jury charged on "'any material hypothesis which

the evidence in his favor tends to establish.'" Ex parte Stork, 475 So. 2d 623, 624 (Ala. 1985). "[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however[ ] weak, insufficient, or doubtful in credibility," Ex parte Chavers, 361 So. 2d 1106, 1107 (Ala. 1978), "even if the evidence supporting the charge is offered by the State." Ex parte Myers, 699 So. 2d 1285, 1290-91 (Ala. 1997), cert. denied, 522 U.S. 1054, 118 S. Ct. 706, 139 L. Ed. 2d 648 (1998). However, "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." § 13A-1-9(b), Ala. Code 1975. "The basis of a charge on a lesser-included offense must be derived from the evidence presented at trial and cannot be based on speculation or conjecture." Broadnax v. State, 825 So. 2d 134, 200 (Ala. Crim. App. 2000), aff'd, 825 So. 2d 233 (Ala. 2001), cert. denied, 536 U.S. 964, 122 S. Ct. 2675, 153 L. Ed. 2d 847 (2002). "'A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury.'" Williams v. State, 675 So. 2d 537, 540-41 (Ala. Crim. App. 1996), quoting Anderson v. State, 507 So. 2d 580, 582 (Ala. Crim. App. 1987).'"

Morton v. State, 154 So. 3d 1065, 1081-82 (Ala. Crim. App. 2013)

(quoting Clark v. State, 896 So. 2d 584, 641 (Ala. Crim. App. 2003)).

### A. Felony Murder

Henderson argues that the evidence supported an instruction on felony murder as a lesser-included offense of capital murder. Unlike

capital murder, a conviction for felony murder does not require proof of the intent to kill. Peoples v. State, 951 So. 2d 755, 758 (Ala. Crim. App. 2006). Instead, to find Henderson guilty of felony murder, the jury would have to find that he had the intent to commit one of several enumerated felonies or "any other felony clearly dangerous to human life," § 13A-6-2(a)(3), Ala. Code 1975, and that, during the course of committing or attempting to commit the felony or in the immediate flight therefrom, he or Carlson caused the death of any person. Shirley v. State, 324 So. 3d 447, 451 (Ala. Crim. App. 2020).

Henderson's felony-murder theory is that the jury could have found that he did not have the intent to kill, but did have the "intent to commit burglary," and that, while he was in the process of committing burglary, it was Carlson who committed the murders. (Henderson's brief, p. 43.) In support of that argument, Henderson contends that there were ample reasons for the jury to find that Carlson's testimony was not credible and that, aside from her testimony, "there was no direct evidence regarding [his] intent or what occurred inside the Smallwood house, leaving real questions as to who committed the murders." (Id.)

"'"'"The purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct."'"'" <u>Whatley v. State</u>, 146 So. 3d 437, 470 (Ala. Crim. App. 2010) (quoting <u>Hall v. State</u>, 820 So. 2d 113, 139 (Ala. Crim. App. 1999), quoting in turn <u>Dobyne v. State</u>, 672 So. 2d 1319, 1345 (Ala. Crim. App. 1994), quoting in turn <u>White v. State</u>, 587 So. 2d 1218, 1231 (Ala. Crim. App. 1990), quoting in turn W. LaFave and A. Scott, 2 <u>Substantive Criminal Law</u> § 7.5 at 210 (1986)). Thus, "[w]here the evidence will support a charge on the offense of capital murder, a charge on the lesser-included offense of felony murder is warranted only if a reasonable theory of the evidence indicates that the murder may not have been intentional." <u>Thompson</u>, 153 So. 3d at 156 (holding that the trial court did not commit plain error by not instructing the jury on felony murder as a lesser-included offense of capital murder because "there was no reasonable theory of the evidence that indicated that the murders were not intentional").

In this case, the evidence overwhelmingly indicated that, whether committed by Henderson or Carlson, the murders were intentional. Both Carlson's testimony and the autopsy reports indicated that the

murders were intentional, and there was abundant evidence of Henderson's intent to kill the victims, including not only Carlson's testimony but also his Internet search history and his statement to Inv. Nash that he "[did not] believe [he] could live with what [he had] done." Thus, "there was no reasonable theory of the evidence that indicated that the murders were not intentional." Thompson, 153 So. 3d at 156. Indeed, Henderson does not contend that the murders were unintentional, only that Carlson was the one who committed them. And, even if the jury believed that Carlson committed the intentional murders, Henderson would still be guilty of capital murder under a complicity theory, see § 13A-2-23, Ala. Code 1975, because there was evidence indicating that he had the intent to kill the victims and that he promoted or assisted Carlson in the commission of the crimes.[10] See Hubbard v. State, 324 So. 3d 855 (Ala. Crim. App. 2019) (affirming capital-murder conviction under complicity theory because there was

---

[10]We note that the prosecutor argued to the jury that Henderson would still be guilty of capital murder under a complicity theory if the jury believed that Carlson committed the murders (R. 1977-78), and the trial court instructed the jury on complicity. (R. 2046.)

evidence indicating that the defendant had the intent to kill and that he had promoted or assisted the commission of the murder).

We recognize that, in Heard v. State, 999 So. 2d 992 (Ala. 2007), the Alabama Supreme Court indicated that there could be situations in which a felony-murder conviction is based on an intentional killing, although the Court was not addressing the propriety of a felony-murder instruction in that case. However, even if a felony-murder conviction may stem from an intentional killing, Henderson still was not entitled to an instruction on that offense.

Henderson's felony-murder theory hinges on his contention that he lacked the intent to kill but that he was committing burglary when Carlson intentionally committed the murders. First-degree burglary is one of the offenses that will support a felony-murder conviction, see § 13A-6-2(a)(3), but, to find Henderson guilty of felony murder instead of capital murder, the jury would have to find, among other elements, that he unlawfully entered the Smallwood house and that he did so with the intent to commit a crime -- other than murder -- while inside the house. See § 13A-7-5, Ala. Code 1975. The problem with Henderson's theory, then, is that there is no evidence indicating that he entered the house

with the intent to commit any crime other than intentional murder. The only evidence Henderson cites in support of his burglary theory is Carlson's testimony that, while he was inside the house, he attempted to locate some "paperwork … he needed … for [his daughter's] school and money that he … had saved up." (R. 1777.) However, although it was a crime for Henderson to enter the Smallwood house, it was not a crime to retrieve his own property from the house, which is to say that, under Henderson's theory, he unlawfully entered the house but did not do so <u>with the intent to commit a crime therein</u>. Thus, under Henderson's theory of the evidence, he was not committing burglary when Carlson committed the murders but, instead, was committing first-degree criminal trespassing, which is a misdemeanor. <u>See</u> § 13A-7-2, Ala. Code 1975 (providing that "[a] person is guilty of criminal trespass in the first degree if he knowingly enters or remains unlawfully in a dwelling" and that the crime is a Class A misdemeanor).

In short, the evidence in this case overwhelmingly indicated that Henderson and Carlson unlawfully entered the Smallwood house with the specific intent to kill the victims therein and that one or both of them did in fact intentionally kill the victims. The evidence therefore

89

supported Henderson's convictions for capital murder, either as a principal or as an accomplice. Furthermore, even if the jury accepted Henderson's theory of the evidence, he would not be guilty of felony murder because, under his theory, he was committing a misdemeanor when Carlson committed the murders. Thus, there was not a rational basis in the evidence for finding that Henderson was guilty of felony murder. Indeed, Henderson's trial counsel conceded that he "[could not], in good conscience, think of any" lesser-included offenses that would apply based on the evidence that had been presented. (R. 1898.) Accordingly, the trial court did not err, and certainly did not commit plain error, by not instructing the jury on felony murder as a lesser-included offense of capital murder.

### B. Reckless Manslaughter

Henderson argues that the evidence supported an instruction on reckless manslaughter as a lesser-included offense of the capital-murder charges involving Loryn. In support of that argument, Henderson points to Carlson's testimony that the couple originally intended to "keep [Loryn]" and "raise [her]" themselves and Dr. Dunton's testimony that Loryn's wounds could have occurred "at the

90

same time that the abdominal wound to Kristen [occurred]." (R. 1665.) Thus, Henderson argues, the evidence supported a reasonable theory that he recklessly, not intentionally, killed Loryn while murdering Kristen.

Dr. Dunton did testify that it was possible that Loryn's wounds could have occurred when Kristen's abdominal wound occurred, although he could not be certain that the wounds occurred simultaneously. However, the mere fact that Kristen's and Loryn's wounds might have occurred simultaneously does not mean that Loryn's wounds were unintentional, as Henderson could have inflicted the wound to Kristen's abdomen with the intent to kill both her and Loryn. Thus, any finding by the jury that Henderson recklessly caused Loryn's death would have been purely speculative, and an instruction on a lesser-included offense cannot be based on speculation or conjecture. Morton, 154 So. 3d at 1082. Plus, there was evidence indicating that Henderson did intentionally kill Loryn. Specifically, Carlson testified that she had told Henderson before they committed the crimes that she "didn't want to be a mom again," and she further testified that Henderson had said to her, while in flight from the crime

scene, that he had "decided that he didn't want the baby," which indicates that he intentionally killed Loryn.

Furthermore, the doctrine of transferred intent applies to capital-murder charges that involve the intentional killing of a pregnant mother in which the unborn child is also killed. Thus, even if Henderson did not, as a matter of fact, intend to kill Loryn, his intent to kill Kristen transferred to Loryn as a matter of law. See Ex parte Phillips, 287 So. 3d at 1190 (holding that a transferred-intent instruction was not improper in a case where the defendant was convicted of capital murder for intentionally killing two people, one of whom was the unborn child of the pregnant mother he killed; "'[a]lthough Phillips correctly contends that "Alabama law is clear that in order to be guilty of capital murder, a defendant ha[s] to have the specific intent to kill" (Phillips's brief, p. 24), Phillips incorrectly argues that "Alabama law requires a defendant to have the specific intent to kill each victim"'" (quoting Phillips v. State, 287 So. 3d 1063, 1129 (Ala. Crim. App. 2015))). See also Graham v. State, 299 So. 3d 273, 326 n.19 (Ala. Crim. App. 2019) ("The Supreme Court clearly found [in Ex parte

Phillips] that the doctrine of transferred intent may be applicable in certain capital-murder cases.").

For the foregoing reasons, there was not a rational basis in the evidence for finding that Henderson recklessly caused Loryn's death. Instead, such a finding would have been purely speculative and would have conflicted with evidence indicating that Henderson intentionally killed all five victims. We also reiterate that Henderson's trial counsel reached the same conclusion, conceding that he "[could not], in good conscience, think of any" lesser-included offenses that would apply based on the evidence that had been presented. Thus, the trial court did not err, and certainly did not commit plain error, by not instructing the jury on that offense as a lesser-included offense of the capital-murder charges involving Loryn.

2.

Henderson argues that the trial court erred by failing to instruct the jury that an accomplice's testimony must be corroborated by other evidence. Section 12-21-22, Ala. Code 1975, provides that "[a] conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant

with the commission of the offense."  Thus, when a defendant's accomplice testifies against him, the trial court must instruct the jury that the accomplice's testimony must be corroborated by other evidence that tends to connect the defendant to the crime.  See Burton v. State, 651 So. 2d 641, 653 (Ala. Crim. App. 1993) (holding that the trial court "should have instructed the jury concerning the need for corroborative evidence of [the accomplice's] testimony").

Henderson correctly notes that the trial court did not instruct the jury that Carlson's testimony had to be corroborated by other evidence that tended to connect him to the murders.  The trial court's failure to give that instruction was error.  However, "[w]e apply the harmless-error rule in capital cases when the circuit court fails to instruct the jury that an accomplice's testimony must be corroborated," Young v. State, 375 So. 3d 813, 867 (Ala. Crim. App. 2021), and such error "'"is harmless when the testimony of an accomplice has in fact been corroborated."'"  Johnson v. State, 120 So. 3d 1130, 1173 (Ala. Crim. App. 2009) (quoting Burton, 651 So. 2d at 654, quoting in turn Gurley v. State, 639 So. 2d 557, 561 (Ala. Crim. App. 1993)).

> "The test for whether evidence sufficiently corroborates
> an accomplice's testimony '"consists of eliminating the

94

testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense."' Ex parte Bullock, 770 So. 2d 1062, 1067 (Ala. 2000) (quoting Andrews v. State, 370 So. 2d 320, 321 (Ala. Crim. App. 1979)). We have said, though, that 'when the testimony of the accomplice is subtracted, the remaining testimony does not have to be sufficient by itself to convict the accused.' Johnson v. State, 820 So. 2d 842, 869 (Ala. Crim. App. 2000)."

Young, 375 So. 3d at 865. Rather, the corroborating evidence "'"need only be slight to suffice"'" and is sufficient if it is "'"of substantive character, … inconsistent with the innocence of [the] defendant[,] and do[es] more than raise a suspicion of guilt."'" Id. (quoting McGowan v. State, 990 So. 2d 931, 987 (Ala. Crim. App. 2003), quoting in turn Arthur v. State, 711 So. 2d 1031, 1059 (Ala. Crim. App. 1996) (other citations omitted)).

In this case, Carlson's testimony was amply corroborated by other evidence that tended to connect Henderson to the murders, including the surveillance-camera videos, which show Henderson and Carlson fleeing the crime scene together; Henderson's Internet search history, which indicates that he planned to commit the murders; and, most notably, Henderson's own statement to Inv. Nash that he "[did not] believe [he] could live with what [he had] done." "[S]ufficient

95

corroboration of an accomplice's testimony '"may be furnished by a tacit admission by the accused, by the suspicious conduct of the accused, and the association of the accused with the accomplice, or by the defendant's proximity and opportunity to commit the crime."'" Young, 375 So. 3d at 865 (quoting Arthur v. State, 711 So. 2d 1031, 1056 (Ala. Crim. App. 1996), quoting in turn Jacks v. State, 364 So. 2d 397, 405 (Ala. Crim. App. 1978)). Thus, even when Carlson's testimony is excluded, the State's evidence tended to connect Henderson to the murders. Therefore, the trial court committed only harmless error when it failed to instruct the jury that Carlson's testimony had to be corroborated by other evidence.

## VI.

Henderson argues that the State violated Batson v. Kentucky, 476 U.S. 79 (1986), by using its peremptory strikes in a racially discriminatory manner. Henderson did not raise a Batson claim at trial, even when the trial court expressly asked the parties if there were any Batson issues they wished to raise (R. 1428-29), so any review of this claim would be for plain error only.

However, for more than a decade now, this Court and several Justices on the Alabama Supreme Court have questioned the propriety of allowing a defendant to rely on plain-error review as an avenue for raising a <u>Batson</u> claim for the first time on appeal. <u>See, e.g.</u>, <u>Keaton</u>, <u>supra</u>; <u>Lane</u>, <u>supra</u>; <u>Ex parte Phillips</u>, <u>supra</u> (Stuart, C.J., concurring specially, joined by Main and Wise, JJ.); <u>White v. State</u>, 179 So. 3d 170 (Ala. Crim. App. 2013); and <u>Ex parte Floyd</u>, 190 So. 3d 972 (Ala. 2012) (Murdock, J., concurring in the result, joined by Malone, C.J., and Bolin, J.). To date, though, a majority of the Alabama Supreme Court has yet to hold that <u>Batson</u> claims may be excluded from this Court's plain-error review. Thus, this Court has continued to review such claims, even when raised for the first time on appeal, because, until recently, plain-error review was mandatory under Rule 45A.

Now, however, Rule 45A provides that plain-error review is discretionary, which means that this Court is not required to consider any claims that were not properly preserved at trial, even in cases in which the death penalty has been imposed. As we noted earlier in this opinion, this Court has decided that it will continue to conduct plain-error review in such cases, but we believe the time has come -- and,

97

with the amendment to Rule 45A, believe we now have the opportunity -- to specifically exclude <u>Batson</u> claims from plain-error review. We need not delve into the multiple reasons why a defendant should not be able to raise a <u>Batson</u> claim for the first time on appeal; those reasons can be reviewed in the cases cited in the preceding paragraph. Briefly, though, Justice Murdock perhaps explained it best when he stated that "the most fundamental reason ... for the proposition that plain-error review not be available to initiate a <u>Batson</u> inquiry on appeal, is the fact that the failure of the trial court to <u>initiate</u> a <u>Batson</u> inquiry simply is not an 'error,' plain or otherwise, by the trial court." <u>Ex parte Floyd</u>, 190 So. 3d at 982 (Murdock, J., concurring in the result). Rather,

> "[t]he decision whether to take advantage of the right to generate evidence for consideration by the trial court pursuant to the <u>Batson</u> procedure is <u>a decision for the defendant, not for the trial court</u>. It is a voluntary decision as to whether to invoke a procedural device that has been made available to defendants in the trial context. ... Not requesting it may be a strategic 'mistake' by defense counsel, but counsel's mistake is not the trial court's 'error.'"

<u>Id.</u> at 983 (some emphasis omitted).

We now hold that, in an exercise of our discretion, this Court will no longer review <u>Batson</u> claims under our plain-error standard when those claims are raised for the first time on appeal. Instead, for a

98

defendant to obtain appellate review of a <u>Batson</u> claim before this Court, even in a death-penalty case, he must raise the claim in the trial court, thereby giving that court the first opportunity to consider the claim and to issue a ruling that may be challenged as erroneous on appeal. Thus, because Henderson did not raise a <u>Batson</u> claim at trial, we will not consider his <u>Batson</u> claim on appeal.

VII.

Henderson argues that the prosecutor made seven improper statements during voir dire, the guilt-phase opening statement, and the guilt-phase closing argument. (Henderson's brief, pp. 85-89.) Henderson did not object to six of the allegedly improper statements, so we review those statements for plain error only. We first address, though, the statement to which Henderson did object.

During the guilt-phase closing argument, the prosecutor argued that the evidence included "a video on [Henderson's] cell phone of himself shooting the murder weapon a week and a half before the murders." (R. 1962.) Henderson's counsel objected, arguing that "there is no evidence that [Henderson] was shooting the murder weapon." (<u>Id.</u>) The prosecutor argued in response that the argument was "a fair

inference from the evidence," and the trial court overruled Henderson's objection and allowed the prosecutor to continue. (Id.)

It is well settled that, "[d]uring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." Ex parte Loggins, 771 So. 2d 1093, 1101 (Ala. 2000) (citations omitted). "Whether an inference is reasonable is generally within the sound discretion of the trial judge." Id. (citations omitted). In this case, there was no direct evidence indicating that the gun Henderson was shooting in the cellular-telephone video was the murder weapon. However, the evidence indicated that Henderson purchased a .22 caliber Ruger brand handgun that he planned to use to commit the murders, and the cellular-telephone video shows him shooting a .22 caliber Ruger brand handgun. (R. 1742.) Thus, it was certainly reasonable for the prosecutor to infer that the gun Henderson was shooting in the cellular-telephone video was the murder weapon. Accordingly, the trial court did not exceed its discretion by allowing the prosecutor to make that argument.

We now turn to the six statements to which Henderson did not object. This Court has thoroughly considered the arguments Henderson has raised in support of those claims, the authorities he has cited, and the applicable parts of the record. Having done so, we are convinced that the challenged statements did not rise to the level of plain error, and, with one exception, we do not find it necessary to provide analyses for those claims. The one claim that we will briefly address is that the prosecutor improperly injected the issue of punishment into the guilt phase of trial.

At the end of the guilt-phase opening statement, the prosecutor told the jury that the evidence would support convictions for 15 counts of capital murder and that the convictions would bring peace for the victims' family and the community. The prosecutor then concluded the opening statement as follows:

> "But we're not stopping at asking for peace, to be honest with you. We are asking to go the next step, the whole reason for all the questionnaires, the whole reason for the individual questions that we asked some of you all next door. We're asking you to take that next step. After you've reached the correct verdict and given the peace of a guilty verdict on all counts, we're asking for more. We're asking for the proper punishment, and in that, we are asking you, after you have weighed any of the [penalty]-phase evidence as you're supposed to, that you come back with a vote for death.

That's what we're asking; that's what we will be asking for, and that's what we request for you at the end of this very, very lonely road."

(R. 1477-78.)

"'[P]unishment is "an improper consideration at the guilt phase of [a capital] trial."'" Brooks v. State, 973 So. 2d 380, 397 (Ala. Crim. App. 2007) (quoting McNair v. State, 653 So. 2d 320, 338 (Ala. Crim. App. 1992), quoting in turn Berard v. State, 486 So. 2d 476, 479 (Ala. 1985)). Thus, the prosecutor should not have told the jury during the guilt phase of trial that, assuming a conviction in that phase, the State would be asking the jury to "come back with a vote of death" in the penalty phase of trial.

However, the jury was already well aware from the extensive voir dire that the State would be seeking the death penalty if Henderson was convicted, and the trial court instructed the jury, just before releasing it to begin its guilt-phase deliberations, that it was "not to concern [itself] with any possible punishment at [that] point." (R. 2053.) The trial court also repeatedly instructed the jury that its task during the guilt-phase deliberations was to determine whether the State had proven Henderson's guilt beyond a reasonable doubt. "[W]e presume

102

the jury followed the trial court's instructions" and focused its guilt-phase deliberations solely on whether the State's evidence had established Henderson's guilt. Bohannon v. State, [Ms. CR-21-0148, Aug. 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023). We therefore conclude that, although it was improper, the prosecutor's reference to punishment during the guilt-phase opening statement did not "seriously affect the fairness or integrity of the judicial proceedings," "seriously affect [Henderson's] 'substantial rights,'" or "substantially prejudice" him. Iervolino, ___ So. 3d at ___ (citations omitted). Thus, no plain error occurred. See McGowan v. State, 990 So. 2d 931, 974 (Ala. Crim. App. 2003) (holding that the prosecutor's reference to punishment during the guilt phase was "probably inappropriate and irrelevant" but did not rise to the level of plain error).

## VIII.

Henderson argues that the prosecutor "improperly commented on [his] silence" during both the guilt and penalty phases of trial. (Henderson's brief, p. 79.) Henderson objected to the prosecutor's guilt-phase comment but did not receive an adverse ruling (R. 1868-69), and he did not object to the prosecutor's penalty-phase comments. (R. 2193,

2206-07.) Thus, Henderson failed to preserve these claims for appellate review, and, as a result, we have reviewed them for plain error only. See Mitchell v. State, 913 So. 2d 501, 505 (Ala. Crim. App. 2005) ("To preserve an issue for appellate review, the issue must be timely raised and specifically presented to the trial court and an adverse ruling obtained." (emphasis omitted)).

"'The Fifth Amendment [to the United States Constitution] guarantees an accused the right to remain silent during his criminal trial and prevents the prosecution [from] commenting on the silence of a defendant who asserts the right.'" Reynolds v. State, 114 So. 3d 61, 136 (Ala. Crim. App. 2011) (quoting Jenkins v. Anderson, 447 U.S. 231, 235 (1980)). Alabama law provides a criminal defendant with the same protection. See Art. I, § 6, Ala. Const.; and § 12-21-220, Ala. Code 1975. The rule that a prosecutor may not comment on a defendant's silence extends to the penalty phase of trial. Mitchell v. United States, 526 U.S. 314 (1999); Ex parte Loggins, supra.

"A challenged comment of a prosecutor made during … arguments must be viewed in the context of the evidence presented in the case and the entire … arguments made to the jury -- both defense counsel's and

the prosecutor's." Ex parte Brooks, 695 So. 2d 184, 189 (Ala. 1997). The prosecutor's comment is improper if, viewing it in that context, the comment

> "'was (1) manifestly intended to be a comment on the defendant's failure to testify or (2) of such character that the jury would have naturally and necessarily taken it to be a comment on the defendant's failure to testify[.]
>
>> "'"'The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so.' [United States v. Swindall, 971 F.2d 1531, 1552 (11th Cir. 1992), cert. denied, 510 U.S. 1040, 114 S. Ct. 683, 126 L. Ed. 2d 650 … (1994) (citations omitted) (emphasis in Swindall).] 'The defendant bears the burden of establishing the existence of one of the two criteria.' [United States v. Muscatell, 42 F.3d 627, 632 (11th Cir.), cert. denied, 515 U.S. 1162, 115 S. Ct. 2617, 132 L. Ed. 2d 859 … (1995).] The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement. [Id.]"
>
> "'[United States v. Knowles,] 66 F.3d [1146,] 1163 [(11th Cir. 1995)].'"

Smith v. State, 797 So. 2d 503, 541 (Ala. Crim. App. 2000) (quoting Thomas v. State, 824 So. 2d 1, 22-23 (Ala. Crim. App. 1999)). With these principles in mind, we turn to Henderson's claims that the prosecutor commented on his silence.

## 1. Guilt-Phase Comment

During the guilt phase of trial, Inv. Nash testified regarding his interrogations of Henderson and Carlson, and the following colloquy occurred during that part of his testimony:

"Q. Who did you interview first?

"A. I interviewed Carlson first.

"....

"Q. After speaking with Carlson in the interview, what did you do next?

"A. After Carlson, I brought in Henderson and advised him of his <u>Miranda</u> rights.

"....

"Q. Did he elect to speak to you at that time?

"[DEFENSE COUNSEL]: Your Honor, I object. That's irrelevant.

"THE COURT: Objection as to relevance.

"[THE STATE]: Well, Inv. Nash eventually does speak to him, but I'm clarifying that at that time he chose not to speak to Investigator Nash.

"[DEFENSE COUNSEL]: It's still doing indirectly -- may I approach?

"THE COURT: Sure.

"(BENCH CONFERENCE)

"....

"[DEFENSE COUNSEL]: Your Honor, I'm just going to object. It's my understanding that [Henderson's] post-arrest silence cannot be made inquiry of under any circumstances, his invocation of right to counsel. It's just a right. It can't be commented on at all.

"[THE STATE]: But he makes a statement to [Inv. Nash] during booking --

"[DEFENSE COUNSEL]: I'm sorry?

"[THE STATE]: A statement. I just wanted to clarify that at some point [Inv. Nash] had advised him of his Miranda, and he chose not to speak until he got to booking. I can try to rephrase it somehow.

"[DEFENSE COUNSEL]: Try to without it appearing like he's exercising his right to remain silent.

"[ASSISTANT DEFENSE COUNSEL]: I think we need a curative instruction that they need to disregard that.

"[THE STATE]: That's fine. As far as the language, I can ask him if he ever spoke to him; how about that?

"[DEFENSE COUNSEL]: Okay.

"(CONCLUSION)

107

"THE COURT: Ladies and gentlemen, at this time I'm going to give you a limiting instruction. I gave you one earlier and explained that at certain times I can give you instructions in terms of how certain evidence can or cannot be considered. With regards to the prior question from [the prosecutor], in terms of the communication or lack thereof between Inv. Nash and Henderson at that time, you will disregard that and not consider that during your ultimate decision in this case. It is not to be considered as any evidence of guilt by you. Go ahead. Rephrase.

"[THE STATE]: Thank you, Your Honor.

"….

"(DIRECT EXAMINATION RESUMED)

"Q. Let me ask it this way, Inv. Nash: At some point that evening, did Henderson speak to you?

"A. Yes.

"Q. Tell me about those circumstances.

"A. Both Carlson and Henderson were taken over to -- well, they were advised they were under arrest, taken over to the Madison County jail for booking. While in the booking area, Henderson looked at me and said, 'Can I talk to you?' I said, 'Sure.' He said words to the effect of, 'Off the record, I'm glad you caught me when you did because I don't believe I could live with what I've done.'"

(R. 1868-70.)

108

According to Henderson, the prosecutor's question to Inv. Nash -- whether Henderson had "elect[ed] to speak" after being advised of his <u>Miranda</u> rights -- was an impermissible comment on his post-arrest silence. We question whether the prosecutor's question actually amounted to a comment on Henderson's post-arrest silence because the question was never answered. However, even if the question was in and of itself improper, the trial court immediately instructed the jury that it was to disregard the question and that the "communication or lack thereof between Inv. Nash and Henderson" could not be construed as evidence of Henderson's guilt. "[W]e presume the jury followed the trial court's instructions," <u>Bohannon</u>, ___ So. 3d at ___, and a direct comment on the defendant's silence is not reversible error if the trial court promptly cures the comment. <u>Smith</u>, 797 So. 2d at 540. Thus, we cannot say that the prosecutor's question rose to the level of plain error.[11]

---

[11]We note that, following defense counsel's objection, the prosecutor told the trial court that he was attempting to "clarify[ ] that at that time [Henderson] chose not to speak to Inv. Nash." Henderson does not argue that that statement was improper and in fact has not even acknowledged it, but we note that the statement would amount to a comment on Henderson's post-arrest silence if the jury heard it. However, it is not clear whether the jury heard that statement, and

## 2. Penalty-Phase Comments

During the initial closing argument at the penalty phase of trial, the prosecutor made the following argument in reference to the testimony of Kathryn Lippert, who had testified for the defense as a "mitigation specialist" (R. 2141):

> "You … heard [Lippert] say … that she's probably met with [Henderson] 10 or 15 times, maybe, throughout her dealing with him. She never mentioned remorse. In any of those conversations, in any of her research about him, never once, until I just mentioned it, has the word 'remorse' come out."

(R. 2193.)

Henderson argues that this part of the prosecutor's closing argument "plainly encouraged the jury and the [trial] court to consider the fact that [he] had remained silent." (Henderson's brief, p. 80.) We disagree. "This Court has held that 'remorse is ... a proper subject of closing arguments,'" Thompson, 153 So. 3d at 175 (quoting Ex parte Loggins, 771 So. 2d at 1101), and we do not believe the jury would have "naturally and necessarily taken [the prosecutor's argument] to be a

---

Henderson does not contend that it did. Furthermore, even if the jury heard that statement, the trial court's instruction sufficiently cured any improper comment on Henderson's post-arrest silence.

110

comment on" Henderson's decision not to testify. Smith, 797 So. 2d at 541 (citation omitted). Instead, taken in context, the jury would have understood the prosecutor's argument to be nothing more than a comment on the fact that Lippert had not testified that she had observed any signs of remorse during her meetings with Henderson, i.e., a comment on the evidence (or lack of evidence), which was proper. Thus, we find no error, much less plain error, in this part of the prosecutor's argument. See Knight v. State, 300 So. 3d 76, 120 (Ala. Crim. App. 2018) (holding that the prosecutor did not make "a direct or even indirect comment on [the defendant's] failure to testify" when he suggested that the defendant had not shown any remorse during a mental-competency evaluation); Jones v. State, 273 Ga. 231, 234, 539 S.E.2d 154, 159 (2000) (holding that it did not "amount to an improper reference to a defendant's failure to testify" when the prosecutor "pointed out that none [of the defendant's mitigation witnesses] had mentioned any expression of remorse"), reversed on other grounds by State v. Lane, 308 Ga. 10, 838 S.E.2d 808 (2020); and Prieto v. Commonwealth, 283 Va. 149, 177-78, 721 S.E.2d 484, 501 (2012) (holding that the prosecutor's statement that he had "waited in vain to

hear an ounce of remorse leak out anywhere" "was not 'a comment on [the defendant's] failure to testify,' but rather a comment on the evidence that had been presented").

Henderson also argues that the prosecutor commented on his silence during the rebuttal closing argument at the penalty phase of trial. To provide some context to the prosecutor's rebuttal, we first note that Henderson's counsel argued during closing argument that it would be fundamentally unfair for Henderson to be sentenced to death when the State had promised Carlson a sentence of life imprisonment without the possibility of parole. Specifically, Henderson's counsel argued:

> "[W]e're dealing with a situation where two people, equally responsible, by the State's own admission -- remember, in for a penny, in for a pound, complicity, you're responsible for the behavior for another -- [Henderson] was for her behavior and [Carlson] was and is for the behavior of [Henderson].
>
> "This is where the notion of what I call fundamental fairness comes to my mind; this is it. One lives, one dies for the same thing, for two people equally involved. My friends, what is the perverse and amoral calculus that goes into making that decision? Explain it to me. [The prosecutor said:] 'We didn't need [Carlson].' Why give her a deal? But if she got a deal, isn't it fair for two people equally involved? I don't understand. I can't wrap my head around that notion that [the prosecutor] now ask[s] you to sentence this man to die while [Carlson] lives. I don't get it. I guess maybe it's not for me to get. But I know one dog-gone thing, it's not fair. It's never fair."

112

(R. 2203-04.)

In rebuttal, the prosecutor argued:

"Do you want to talk about fairness in this case? Fairness, what's fair? They have made this case about [Carlson], and they spent all of mitigation talking about how awful life [imprisonment] without [the possibility of parole] is; it's terrible. Well, that's what [Carlson] got. What they are saying is so awful, [Carlson] got it.

"But when you're talking about fairness, weighing fairness and her deal, does carrying the gas can and being the helper weigh the same as plunging a knife into a 67-year-old grandmother's eye? That's the same? Performing surgery in a nasty, dirty, greasy garage floor doing a makeshift C-section? It's the same? It's unfair? What's fair? [Carlson] got what's coming to her, but this ain't about [Carlson]. This ain't about her; this ain't about what she did. You know what? <u>She owned what she did. Accountability. She didn't deny it</u>. 'This is what I did,' and she's going to pay the price. But today is not about [Carlson]. The deal we gave her -- if you're talking about fairness of what they did, what [Carlson] did versus [Henderson], is it fair that we would give her the same thing we gave him after what he's done? [Carlson] had blood on her hands for helping. He had literal blood on his hands for what he did. That's different. That is fundamentally different.

"….

"Mercy. What we didn't hear …. Fifteen visits [with Lippert] and not one mention of remorse, <u>not one mention of 'I'm sorry.' It's been six years. Nothing. Nothing. No evidence of it, no -- [Lippert] met with him over and over</u>

113

again. She had a relationship with him. No remorse whatsoever. Yet they ask for mercy."

(R. 2206-07 (emphasis added).)

In support of his argument, Henderson relies on those parts of the prosecutor's argument we have emphasized. However, taken in context, the prosecutor's argument that Carlson "owned what she did" and "didn't deny it" was not intended to draw attention to the fact that Henderson had chosen not to testify, and we do not believe the jury would have "naturally and necessarily taken" the argument that way. Smith, 797 So. 2d at 541 (citation omitted). Instead, that part of the prosecutor's argument was an attempt to explain, in response to defense counsel's argument regarding fundamental fairness, why the State had offered Carlson a less severe sentence than it was pursuing against Henderson. And, as we have already explained, the prosecutor's argument regarding Henderson's lack of remorse was a proper comment on the evidence (or lack of evidence). See Jones, 273 Ga. at 234, 539 S.E.2d at 159 (holding that it did not "amount to an improper reference to a defendant's failure to testify" when the prosecutor "pointed out that none [of the defendant's mitigation witnesses] had mentioned any expression of remorse"); and Prieto, 283 Va. at 177-78, 721 S.E.2d at

114

501 (holding that the prosecutor's statement that he had "waited in vain to hear an ounce of remorse leak out anywhere" "was not 'a comment on [the defendant's] failure to testify,' but rather a comment on the evidence that had been presented"). Thus, we find no error, much less plain error, in this part of the prosecutor's argument.

IX.

Henderson argues that § 13A-5-46(f), Ala. Code 1975, violates the Sixth Amendment because it allows a jury to recommend a death sentence by the votes of only 10 jurors, rather than requiring a unanimous vote. Specifically, Henderson argues that § 13A-5-46(f) "can no longer stand in light of" the United States Supreme Court's decision in Ramos v. Louisiana, 590 U.S. ___ (2020). However, this Court has already rejected that argument, noting that "Ramos held only that the United States Constitution requires a unanimous verdict to support a conviction, not a sentence." Keaton, 375 So. 3d at 137, cert. denied, ___ U.S. ___, 143 S. Ct. 2585. Henderson also argues that § 13A-5-46(f) violates the Eighth Amendment to the United States Constitution, but he cites no authority that supports that argument. We also note that § 13A-5-46(f) has been part of Alabama's Criminal Code for more than 40

years, and the United States Supreme Court has yet to hold that a jury's less-than-unanimous sentencing verdict violates any part of the United States Constitution.

Henderson also argues that § 13A-5-46(f) violates the Alabama Constitution, which, he says, "require[s] unanimity for death verdicts." (Henderson's reply brief, p. 12.) However, this Court has also previously rejected that argument. See Frazier v. State, 562 So. 2d 543, 551 (Ala. Crim. App. 1989) (noting that, under the Alabama Constitution, "no particular numerical vote [is] required" for a jury's sentencing verdict), reversed on other grounds by Ex parte Frazier, 562 So. 2d 560 (Ala. 1989); and Edwards v. State, 515 So. 2d 86, 89 (Ala. Crim. App. 1987) (holding that "an advisory verdict based on the vote of 10 of the jurors" does not violate the Alabama Constitution). Henderson's reliance on Beck v. State, 396 So. 2d 645 (Ala. 1980), is misplaced because nothing in that opinion speaks to the constitutionality of a jury's less-than-unanimous sentencing recommendation in the penalty phase of a capital-murder trial.

X.

Henderson has also raised several other claims on appeal, which are listed in his brief as Issues VII, VIII, X, XI, XII, XV, XVII, XIX, XXII, and XXIII. Henderson did not raise any of these claims below, so we review them for plain error only. This Court has thoroughly considered the arguments Henderson has raised in support of these claims, the authorities he has cited, and the applicable parts of the record. Having done so, we are convinced that no plain error occurred with respect to these claims, and we do not find it necessary to provide analyses for them. In addition to reviewing these claims, this Court has painstakingly reviewed the entire record for any instances of plain error that Henderson might have overlooked, and we have found no such error.

## XI.

Finally, pursuant to § 13A-5-53(a), Ala. Code 1975, this Court must review the propriety of Henderson's death sentence. Specifically, we must determine whether there was any error in the sentencing proceedings that adversely affected Henderson's rights, whether the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence, and whether death is the

117

proper sentence.  In determining whether death is the proper sentence, this Court must determine

> "(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
>
> "(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
>
> "(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

§ 13A-5-53(b), Ala. Code 1975.  The determinations required by § 13A-5-53(b) must be "explicitly address[ed]" by this Court in all cases in which the death penalty has been imposed.  § 13A-5-53(c), Ala. Code 1975.

The jury, by virtue of its guilt-phase verdicts, found the existence of two aggravating circumstances: (1) that the offenses were committed while Henderson was engaged in or was an accomplice to a burglary and (2) that Henderson caused the death of two or more people by one act or pursuant to one scheme or course of conduct.  See § 13A-5-49(a)(4) and (9), Ala. Code 1975.  During the penalty phase, the jury unanimously found the existence of a third aggravating circumstance --

that the offenses were especially heinous, atrocious, or cruel compared to other capital offenses. See § 13A-5-49(a)(8), Ala. Code 1975.

The trial court found the existence of one statutory mitigating circumstance -- that Henderson had no significant history of prior criminal activity. See § 13A-5-51(1), Ala. Code 1975. The trial court also found the existence of the following nonstatutory mitigating circumstances: "Henderson's good behavior while incarcerated, the love of family; Henderson's history of gainful employment; the non-death sentence that Rhonda Carlson negotiated in exchange for her testimony against Henderson, fundamental fairness, the purpose and value of life, and mercy." (C. 272.) The trial court found, though, that those mitigating circumstances were "greatly outweigh[ed]" by the aggravating circumstances. (C. 278.)

This Court has thoroughly reviewed the sentencing proceedings and has found no error that adversely affected Henderson's rights. We have also determined that the trial court's findings regarding the aggravating and mitigating circumstances are supported by the evidence. Thus, we turn to the final aspect of our review, i.e., whether death is the proper sentence in this case.

119

First, we find no indication that Henderson's sentence was imposed "under the influence of passion, prejudice, or any other arbitrary factor." § 13A-5-53(b)(1). To the contrary, the trial court's sentencing order indicates that the court based its sentencing decision on a thorough and conscientious consideration of the facts, a weighing of the aggravating and mitigating circumstances, and the jury's advisory verdict. Second, we have independently weighed the aggravating and mitigating circumstances and agree with the trial court's conclusion that the aggravating circumstances outweigh the mitigating circumstances. Finally, we note that Henderson's sentence of death is not excessive or disproportionate to the sentence imposed in similar cases. See Petersen v. State, 326 So. 3d 535 (Ala. Crim. App. 2019) (affirming death sentence for intentional murders committed during a burglary and pursuant to one scheme or course of conduct); Keaton, supra (affirming death sentence for intentional murders that were deemed heinous, atrocious, or cruel and involved victims who were less than 14 years of age); and Callen v. State, 284 So. 3d 177 (Ala. Crim. App. 2017) (affirming death sentence for intentional murders that were committed during the course of committing arson, that were

committed pursuant to one scheme or course of conduct, and that involved a victim who was less than 14 years of age). Thus, we conclude that a sentence of death was the proper sentence in this case.

## Conclusion

For the foregoing reasons, we affirm Henderson's 15 capital-murder convictions and his resulting sentence of death.

AFFIRMED.

Windom, P.J., and Cole and Minor, JJ., concur. Kellum, J., dissents in part and concurs in the result in part, with opinion.

KELLUM, Judge, dissenting in part and concurring in the result in part.

I agree to affirm 14 of Christopher Matthew Henderson's capital-murder convictions, and his sentence of death, although not necessarily for all the reasons stated in the main opinion. However, I must respectfully dissent from affirming Henderson's conviction for murder made capital because it was committed where a court had issued a protection order for the victim and against the defendant, see § 13A-5-40(a)(19), Ala. Code 1975, because I do not believe the State presented sufficient evidence to sustain that conviction.

I agree with the main opinion that § 13A-5-40(a)(19) "requires proof that a court had issued a protection order against the defendant and in favor of the victim and that the order was in effect at the time of the victim's death." ___ So. 3d at ___. The main opinion, however, does not hold the State to that burden, instead concluding that the evidence was sufficient to sustain Henderson's conviction because the State presented evidence that a protection order "was issued and served on Henderson less than 10 days before Kristen's death." ___ So. 3d at ___. I do not believe the fact that the protection order was issued and served

122

on Henderson less than 10 days before the murders is, by itself, sufficient to establish that the order was still in effect at the time of the murders. Although a protection order remains in effect "until the final hearing date," § 30-5-6(b), Ala. Code 1975, and that hearing "shall" be "within 10 days" of service on the defendant, § 30-5-6(a), Ala. Code 1975, the hearing could also be held less than 10 days after service on the defendant. Moreover, as the main opinion points out, the other evidence regarding the protection order -- the handwritten notation consolidating the protection order with the divorce proceedings scheduled for August 3, 2015, one day before the murders, and Henderson's text message on August 3, 2015 -- is ambiguous as to whether the hearing on the protection order was, in fact, held on August 3, 2015, and, if so, what the outcome of the hearing was, i.e., whether or not the protection order was extended. Such ambiguity is not, in my view, sufficient to satisfy the State's burden of proof and to allow a jury to reasonably conclude that the evidence excluded every reasonable hypothesis except that of guilt. See, e.g., Vason v. State, 323 So. 3d 698, 704 (Ala. Crim. App. 2020) ("In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the

jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt." (internal citations and quotation marks omitted)).